## LA PORTE HEINEKAMP MOTOR CO. v. FORD MOTOR CO.

District Court, D. Maryland. April 10, 1928.

No. 3500.

**1. Corporations ☞668(15)—Foreign corporation is "doing business" within state, where character of business warrants inference that corporation has subjected itself to local jurisdiction.**

Activities of foreign corporation constitute "doing business" in state, rendering service on officers or agents valid, where business is of such a nature and character as to warrant the inference that corporation has subjected itself to the local jurisdiction and is present by its officers and agents within the state or district.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Doing Business.]

**2. Corporations ☞668(15)—That transaction sued on arose in state held relevant in determining whether foreign corporation sued was subject to service of process therein.**

In determining whether foreign corporation is doing business in state so as to be subject to service of process therein, fact that transaction in suit arose out of activities of the foreign corporation within the state where service was made is relevant, though not conclusive.

**3. Corporations ☞668(15)—Continuous solicitation of orders by foreign corporation delivering goods and receiving payment in state constitutes "doing business."**

While mere solicitation of business in state by foreign corporation is insufficient to constitute doing business, a continuous course of business in solicitation of orders by corporation which receives payment for goods and takes notes of customers payable and collectible at banks within the state constitutes doing of business which will subject corporation to suit within the state.

**4. Corporations ☞668(15)—Foreign corporation manufacturing automobiles, whose agent was present soliciting business, making collections and supervising dealers, held subject to local jurisdiction as doing business in state.**

Foreign corporation manufacturing automobiles, with numerous dealers in state, who bought and resold corporation's cars and were subject to constant and intimate supervision of details of their business by corporation's agent present in state soliciting business and making collections, held, doing business within state, and therefore subject to service of process in state, in suit by local dealer based on business transaction arising within state.

At Law. Suit by the La Porte Heinekamp Motor Company against the Ford Motor Company. On defendant's motion to quash the service of summons. Motion overruled.

Henry Zoller, Jr., of Baltimore, Md., for plaintiff.

Haman, Cook, Chesnut & Markell, of Baltimore, Md., for defendant.

SOPER, District Judge. La Porte Heinekamp Motor Company brought a suit at law in the superior court of Baltimore city against the Ford Motor Company. The declaration contains six common counts, in assumpsit, for money payable by the defendant to the plaintiff, and also a special count in which it is alleged that on January 2, 1924, the defendant granted to the plaintiff the privilege of selling Ford Automobiles and other products, within the boundary of the United States; that the plaintiff accepted the grant, and, in the exercise thereof, built up under the aid and instigation of the defendant's agents an extensive and lucrative business in automobile parts, and continued to operate it profitably until April 1, 1927, when the defendant arbitrarily withdrew from the plaintiff the privilege of continuing the business after April 15, 1927, without compensation either for the business or for the large stock of parts purchased for the purpose of supplying the demands of the business. The damages claimed are $100,000. The defendant was summoned by service on Byron J. Wilson, its agent and traveling representative. The case was removed from the state to the federal court on the ground of diverse citizenship; the plaintiff being a Maryland, and the defendant a Delaware, corporation. After the removal of the case, the defendant appeared specially, and made a motion to quash the service of summons on the ground that the defendant at the time of the suit was not doing business in the state of Maryland. Testimony was taken, and the following facts were disclosed:

The Ford Motor Company has no factory, warehouse, or office in Maryland. It has a factory in Detroit, Mich., and various assembling plants throughout the country, where automobiles are put together, the nearest of which to Baltimore is located at Chester, Pa. It also has a place of business in Washington. There are no sales of automobiles or other products by the Ford Motor Company to users in Maryland. A number of dealers are appointed in Maryland, as in other parts of the country, but they do not sell as agents of the company. The cars are purchased from the company outright, and are shipped from Chester, on sight draft with bill of lading attached, or, if driven into Maryland, are delivered to dealers upon receipt of check. The dealers are selected, having regard to their qualifications, standing in the community, and financial condition. They are appointed by the com-

pany at Detroit upon the recommendations of the branch manager in Chester.

Byron J. Wilson is the traveling representative of the Ford Motor Company, under the supervision of the Chester branch, which covers Maryland, Delaware, and Virginia. He has no office in Maryland, and has no authority to make contracts for the company. Speaking generally, his duties are to call on the dealers from time to time to see that they are carrying on the business in a proper manner, and that satisfactory service is furnished to the public. For the same purpose, he also calls upon and inspects the places of business of the service dealers or garages which render service and make repairs to Ford cars. He endeavors also in every way to stimulate sales by the dealers and to instruct them in methods of salesmanship. Thus stated, his activities may seem to be so small a part of the defendant's business that it would be incorrect to say that the Ford Motor Company is doing business in Maryland, as that phrase has been interpreted by the state and federal courts. Indeed there are certain decisions of the courts in similar cases which go to this extent. See Southeastern Dist. Co. v. Nordyke, etc., Co., 159 Ga. 150, 125 S. E. 171; Holzer v. Dodge Bros., 233 N. Y. 216, 135 N. E. 268; Zimmers v. Dodge Bros. (D. C.) 21 F.(2d) 152; S. S. McMaster, Inc., v. Chevrolet Motor Co. (D. C.) 3 F.(2d) 469.

But, when the activities of the traveling representative in the case at bar are more closely examined, it becomes clear that he performs duties more varied than those described in the cases cited, and exercises an important function for his employer in Maryland. He has spent on the average of 5 days a week in Baltimore, residing nearly always at the same hotel, where he has been within easy reach of the Ford dealers. He has called upon the dealers and service stations constantly, and has exercised an intimate supervision and control over their business. When the suit was brought, there were 10 dealers in Baltimore city, and, during an earlier period, when the Ford factory was in full blast in the manufacture of model T, recently abandoned, there were 13 dealers in Baltimore city and 30 dealers in the state. In addition, there were between 300 and 400 service dealers or garages entitled to display a sign "Authorized Ford Service." The agent was useful in selecting dealers and service stations; his recommendations being submitted from the Chester branch to the factory at Detroit for final approval. Coming from the man on the ground, such recommendations were not without weight.

Each dealer annually entered into a contract with the Ford Motor Company, which was called a sales agreement, although strictly speaking it was not a contract for the sale of cars. Therein the dealer was granted the privilege of selling cars, accessories, etc., and agreed to maintain a properly equipped salesroom and service station, acceptable to the company, and prominently located. The company was to be in no way responsible for any of the charges of the business. The dealer agreed to furnish before the end of each year an estimate of the number of cars he would sell in the following year, in order that the company might determine the prospective requirements of its business; but the company, while agreeing to give the estimate careful attention, did not promise absolutely to furnish the cars. The agreement fixed the rate at which the cars should be sold by the company, together with the discount, and provided that the title to all the products should remain in the company until paid for. The price of the cars, and the amount of the freight charges to be charged by the dealer to the retail buyers, were fixed. The dealer promised to obtain from each purchaser a written order, together with a cash deposit of a fixed amount, and to furnish these orders to the company upon request. The company was given the right to visit the dealer's place at any time and check up the retail buyers' orders. The agreement did not run for any particular length of time, for it was provided that it might be canceled at any time upon written notice by either party.

It is noteworthy that the dealer is not an agent of the Ford Motor Company, and that the company assumes no responsibility for his obligations; but, on the other hand, the company in actual practice maintains a very definite control over the management of his business. It grants him the privilege of selling Ford automobiles and parts, but it reserves the right to appoint other dealers within the state, and to make direct sales of its products to customers. It agrees to give careful attention to the dealer's estimate of the number of automobiles he will be able to sell at retail during the year, but reserves the right to refuse cars or parts, as it may deem necessary or proper. It reserves the right, as does the dealer, to terminate the agreement at any time. While the dealer is technically quite independent of the company, nevertheless the latter has the right at any time to visit the dealer's place of business and

check up and verify all retail buyer's orders. Furthermore the actual control exercised by the traveling representative over the dealer's business is even broader than the sales agreement suggests. As a matter of practice, the dealer is required to file a 10-day report on a blank furnished by the company on the 10th, 20th, and the last day of each month. It includes a summary of the retail sales and deliveries during the period, the goods on hand, the orders on file for delivery, the number of demonstrations during the period, and other information. The report could hardly be more complete if the dealer were in fact the agent of the company. He is also expected to make a used car report in connection with the 10-day report, showing the dates when the cars were taken in, the names of the sellers, and the amount allowed on the cars as a trade in allowance. It is explained that the purpose of the 10-day report is to enable the Ford Company to get information so as to gauge its production for the ensuing 30 or 60 days.

The traveling representative is allowed the utmost freedom in inspecting not only the place of business, but also the books and accounts of the dealer, in order not only to insure adequate service to the public, but also to induce the dealer to increase his purchases. If the dealer is not carrying a sufficient stock of automobiles or parts in the opinion of the agent, he solicits the dealer to send in orders. If the company desires to dispose of particular accessories, such as storage batteries, it is the business of the agent to prevail upon the dealer to buy them. If the dealer falls short in ordering cars, according to his yearly estimate, the agent seeks to bring him up to the mark. From time to time it happens that a dealer is unable or unwilling to meet the drafts for cars which are shipped him by the defendant. On such occasions, the agent arranges for some other dealer or dealers to take over the shipment and purchase the cars. The checks of the purchasers in such cases are made out to the dealer to whom the cars were shipped in the first instance. Whatever may be the reason for this method of payment, the actual benefit of the sale accrues to the Ford Motor Company.

The activities of the agent are not confined to inspection and sales. He also makes collections. The Ford Motor Company aims to sell its goods for cash, and therefore usually forwards the bill of lading to a local bank, with sight draft attached; but it happens not infrequently that the dealers are not ready to take up the drafts when demand is made. In these cases, the agent visits the dealer, urges him to lift the draft, and sometimes secures a check and delivers it to the bank in payment of the draft. This practice has become a regular part of the agent's duties.

The dealers are called together from time to time for the discussion with the agent of their common problems. Sometimes the secondhand car situation is discussed; sometimes an effort is made to meet the wishes of the company in putting upon the market and selling to customers special articles which the company has on hand. It is also the duty of the agent to adjust disputes between dealers which may arise, for instance, when one dealer sells a car at less than the list price. Advertisements of the Ford car and accessories, which are beneficial to all of the dealers, are sometimes jointly inserted and paid for. It is the custom to submit these advertisements to the approval of the agent.

What has been said above as to the inspection by the agent of the business of the dealers applies as well in most respects to the places of business of the service garages throughout the state.

Summarizing this recital of the relations between the Ford Motor Company and the residents of Maryland, who handle its products, it appears that, while the company does not maintain within the state an agent with power to bind it by contract, nevertheless the actual supervision and control exercised by it through its traveling representative is almost as complete as if the dealers were its agents in all respects. The privilege of handling Ford cars and other products is evidently valuable, and, since the company may withdraw it at any time, it is not difficult to prevail upon the dealer to comply with the company's demands. The work of the local representative in this connection is of substantial benefit to the defendant. He not only stimulates the dealers to do their utmost in distributing the company's products, but incidentally secures information which enables the company to regulate its output in conformity to the demands of the public. Much of this he accomplishes through an almost daily contact with the various sellers of Ford products within the state; and, when the importance of the problem of distribution in this great business is considered, it becomes clear that the activities of the company within the state, as distinguished from those of the dealers, are not negligible.

[1, 2] The legal question is whether the activities thus described constitute the doing of business by the Ford Motor Company in

Maryland. "The general rule deducible from all our decisions," says the Supreme Court in People's Tobacco Co. v. American Tobacco Co., 246 U. S. 79, 87, 38 S. Ct. 233, 235 (62 L. Ed. 587, Ann. Cas. 1918C, 537), "is that the business must be of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction and is by its duly authorized officers or agents present within the state or district where service is attempted." See, also, Phila. & Reading R. Co. v. McKibbin, 243 U. S. 264, 37 S. Ct. 280, 61 L. Ed. 710; Green v. C., B. & Q. Ry., 205 U. S. 530, 532, 27 S. Ct. 595, 51 L. Ed. 916. In applying this rule to the facts of the case at bar, it is relevant, but not conclusive, that the transaction in suit seems to have arisen out of the activities of the Ford Motor Company in this state. It was said by Judge Rose, in Frey v. Cudahy (D. C.) 228 F. 209, 213, that "whether a nonresident corporation is doing business specially, so as to subject it to suit at the instance of a particular defendant [plaintiff], may depend in part upon the relation of the things it is doing to the cause of action asserted. Mutual Life Ins. Co. v. Spratley, 172 U. S. 602, 618, 19 S. Ct. 308, 43 L. Ed. 569." See, also, Davis v. Farmers' Co-operative Co., 262 U. S. 312, 316, 43 S. Ct. 556, 67 L. Ed. 996; Rendleman v. Niagara Sprayer Co. (D. C.) 16 F.(2d) 122.

[3] That which the agent of the defendant did in Maryland was solicitation of business, and something more. It is well settled that solicitation alone is insufficient to constitute doing business in a technical sense. Green v. C., B. & Q. Ry., 205 U. S. 530, 27 S. Ct. 595, 51 L. Ed. 916. On the other hand, it has been held that where there is a continuous course of business in solicitation of orders by a foreign corporation, which were sent to another state, and in response to which goods of the corporation were delivered within the state, and the agents not only solicited orders in the state, but received payment for goods, in money, checks, or drafts and took notes of customers, payable and collectible at banks within the state, there was a doing of business which would subject the corporation to suit within the state. International Harvester Co. v. Kentucky, 234 U. S. 579, 34 S. Ct. 944, 58 L. Ed. 1479. See, also, Meade Fibre Co. v. Varn (C. C. A.) 3 F.(2d) 520.

[4] Measured by the facts decided to be sufficient in the case of the International Harvester Company, it seems to be clear that the Ford Motor Company was doing business in Maryland. Its agent, although not tech-nically a resident of the state, was actually here the greater part of the business week. He not only solicited and obtained business, but made collections for the payment of drafts and for cars rejected by the dealer to whom they had been shipped. He exercised the constant and intimate supervision of the details of the business of the dealers which has been described. His manifold activities constituted a part of the company's business in Maryland so substantial as to warrant the inference that it was there present.

The motion to quash the summons will be overruled.