## MOORE MACHINERY CO. v. STEWART-WARNER CORPORATION.

### No. 20484–S.

District Court, N. D. California, S. D.
April 11, 1939.

Keyes & Erskine, of San Francisco, Cal., for plaintiff.

Chickering & Gregory, of San Francisco, Cal., for defendant.

ST. SURE, District Judge.

Plaintiff, a resident of California, brought suit in the state court, and defendant removed to this court on the ground of diversity of citizenship. The action arose out of disputes over transactions occurring while plaintiff was acting under contracts as defendant's "distributor" in portions of California, Nevada, and Arizona.

Defendant appeared here specially and moved to quash service of summons on the ground that defendant is a Virginia corporation with its principal place of business in Chicago, Illinois; that it maintains no office and transacts no business in California; that plaintiff attempted to serve defendant by serving the Secretary of State in accordance with § 406a of the Civil Code of California; that said attempted service is void because at the date of filing the complaint defendant was not doing business in the state of California, nor had it at any time transacted intrastate business in the state as defined in § 405 of the Civil Code of California.[1] This is the sole question for decision under the facts, as shown by the contracts directly involved and affidavits of the parties.

The determination of this question "is often a matter of great difficulty and extreme nicety. No all-embracing rule as to what is doing business has been laid down." Fletcher Cyclopedia Corporations, Permanent Edition, Vol. 18, § 8733. In Hutchinson v. Chase & Gilbert, 2 Cir., 45 F.2d 139, a case in which the defendant had never done any continuous business in New York state, Judge Learned Hand, in considering the question, found it, 45 F.2d page 142, "quite impossible to establish any rule from the decided cases; we must step from tuft to tuft across the morass." In Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 115 N.E. 915, 917, 918, the late Judge Cardozo said: "If in fact it [the corporation] is here, if it is here, not occasionally or casually, but with a fair measure of permanence and continuity, then, whether its business is interstate or local, it is within the jurisdiction of our courts," citing International Harvester Co. v. Kentucky, 234 U.S. 579, 34 S.Ct. 944, 58 L.Ed. 1479. "But there is no precise test of the nature or extent of the business that must be done. All that is requisite is that enough be done to enable us to say that the corporation is here." As pointed out in International Harvester Co. v. Kentucky, supra, each case must depend upon its own facts.

Plaintiff has sued defendant for "goods sold and delivered, money had and received, and damages," in the total sum of $54,053.10 with interest. The complaint contains twenty-two counts, and attached to it as exhibits are six contracts, extended reference to one of which will suffice to show defendant's method of doing business. Exhibit "A" is an agreement relating to the sale of lubrication products known as Alemite. It was made between the parties on August 1, 1936, at Chicago, Illinois, and shows the following facts:

Defendant granted to plaintiff an exclusive franchise for fifteen counties in southern California and one in Nevada, reserving to itself the "exclusive right to sell its products in the territory" mentioned "to all railroads, manufacturers of motors, motor vehicles and motorboats, and to any other manufacturers who might use Alemite Products as factory equipment on their products." Defendant also reserved to itself "the right to grant, bargain, sell or give away its products in the territory hereby granted to plaintiff to any and all persons, firms, or corporations, including persons or corporations engaged in the selling of petroleum and its products or tires, directly or indirectly, through subsidiaries or associated companies doing business or having branches in two or more states or territories of the United States." Plaintiff agreed "to service and keep in good condition and repair" all products so sold by defendant direct, accepting in full payment such sum as defendant "may in its sole discretion, determine to be fair and reasonable compensation." Plaintiff agreed not to make repairs on any products other than those of defendant, and not to purchase, carry in stock, handle, or deal in any other products than defendant's; to buy defendant's products, advertising matter, and stationery at prices established by defendant. For plaintiff's failure to meet payments promptly, defendant could terminate the agreement by writing or telegram.

In January of each year defendant would notify plaintiff of the quota of products which plaintiff was expected to sell each month. If sales fell below 65% of the quota, defendant could terminate the

[1] § 405, C.C. provides: "The term 'transact intrastate business' * * * means entering into repeated and successive transactions of its business in this State, other than interstate or foreign commerce."

agreement. Plaintiff agreed to spend a certain amount annually for advertising, as directed by defendant. Plaintiff could not return any products without defendant's permission, and if permission were given, a handling charge of 10% would be made.

Plaintiff would use the trade name "Alemite" in connection with goods purchased from defendant, but this was a revocable license. Plaintiff would conduct its own business in its own name and upon its own responsibility "and has no authority whatsoever to bind" defendant, and plaintiff would not hold itself out as agent of defendant or use the name "Alemite" in any manner tending to give the impression that plaintiff represented Alemite in any way whatsoever. Plaintiff agreed to indemnify defendant from all claims for damages to property or for personal injuries sustained by any third party, growing out of the conduct of the business.

Plaintiff would, during the first ten days of each month, give defendant a complete statement of all sales made by plaintiff, and would at all times permit a duly authorized agent of defendant to examine plaintiff's books; would furnish defendant with a statement of its inventory of Alemite products whenever defendant so requested, and also an inventory of plaintiff's furniture, fixtures, equipment, and building improvements and betterments.

Defendant could cause the properties in such inventory to be insured against fire at their full value under a general policy protecting all distributors under contract with defendant against fire loss, plaintiff to pay for such insurance. In case of loss by fire, defendant could collect the insurance, and after deducting any sum due defendant from plaintiff, return the surplus, if any, to plaintiff.

This contract, if not sooner terminated by either party under the conditions provided, would expire on December 31, 1937. Upon cancellation or termination of the contract, the products enumerated which were left in plaintiff's hands would be sold and transferred to defendant at the prices named. All advertising signs bought by plaintiff from defendant would be repurchased by defendant under the conditions and at the prices named.

The cancellation or termination of this contract would be construed as a resale by plaintiff to defendant of all products which defendant was required or elected to repurchase. Any rights under this contract would not be transferable without defendant's consent.

Exhibit "C" is a contract similar to exhibit "A," but applies to forty-three counties in California and ten in Nevada.

Exhibit "D" is a similar agreement covering radios and parts, designated as radio products, covering fourteen counties in southern California, four in Nevada, and one in Arizona. In this contract plaintiff agreed: "To solicit and establish within its territory retail outlets herein referred to as 'Dealers' to sell and service Stewart-Warner radio products"; to furnish defendant with a list showing names, addresses, activities, etc., of such dealers; "to maintain an adequate radio sales force and an adequate staff of technical experts trained in the selling and servicing of Stewart-Warner radio products"; that charges for repairing radios would not be in excess of prices established by defendant; to maintain such test equipment and tools as defendant may recommend.

Defendant reserved "the right to fill service orders and requests direct from the factory when in" defendant's "opinion conditions seem to warrant such action."

In case of cancellation of this contract defendant reserved the right to sell through other outlets. Upon cancellation or termination of the contract defendant agreed to repurchase at a certain price plaintiff's inventory of radios which were in good condition.

Exhibit "E" is similar to exhibit "D," but covers forty-seven counties in northern California and nine in Nevada.

Exhibit "F" is similar to exhibit "D", but is for "refrigerators and parts therefor," designated as refrigerator products, and covers eleven counties in southern California, four in Nevada, and one in Arizona. It also provides that defendant reserves to itself "any and all business with Governmental Agencies, and Educational and Charitable Institutions." Plaintiff agreed to cooperate with defendant in the installation and servicing of all refrigerator products so sold, defendant to pay plaintiff for such work "on a basis determined by" defendant.

Exhibit "G" is similar to exhibit "F," except that it covers forty-seven counties in northern California and nine in Nevada.

All of the contracts between the parties were terminated by mutual consent. The Alemite contracts, exhibits "A" and "C," were terminated on or about September 25, 1937. F. B. Kirch, assistant secretary and treasurer of defendant, states in an affidavit that on or about September 27, 1937, defendant caused to be organized under the laws of California a corporation known as Alemite Company of Southern California. The entire capital stock was subscribed for by defendant, and the Company took over the inventory of plaintiff. On September 29, 1937, defendant caused to be organized Alemite Company of Northern California, and the same procedure was followed. Since October 1, 1937, these two corporations "have acted as distributors for" defendant "under the same terms and conditions as distributors are appointed and act in other states of the United States." The remaining four contracts, exhibits "D," "E," "F," "G," relating to radio products and refrigerator products, were taken over by defendant on or about December 15, 1937, and transferred to other "distributors."

Defendant is a nationally known corporation, and it is a matter of common knowledge that it markets its products in every state of the Union. In the instant case there were contracts between the parties for portions of three states. Mr. Kirch, assistant secretary and treasurer of defendant, in his affidavit speaks of doing business "in other states of the United States." In the affidavit of L. A. Ballard, employed in the sales department of defendant, mention is made of defendant's "nation-wide" business.

It is apparent that the contracts were drawn with a studied attempt to circumvent the laws of agency and state statutes relating to jurisdiction and the service of process. But calling the plaintiff a "distributor" rather than an agent, or using such phrases as are employed in paragraph 9 of the contract[2] does not obscure the real facts and purpose of defendant.

Defendant sent into California its agents, called factory men, who instructed plaintiff in sales policies and methods; held meetings of plaintiff's salesmen and instructed them in the sales methods they were to use; held meetings of salesmen, jobbers, and dealers; together with agents of plaintiff, called upon dealers and jobbers in an endeavor to aid plaintiff's agents in making sales; gave plaintiff advice regarding methods of advertising; assisted plaintiff in servicing Alemite products theretofore sold; actively stimulated and promoted sales of products. These facts are amply shown by the correspondence between the parties.

The business done by defendant in this state may be described, in the language of the cases, as "substantial," "permanent," and "continuous." Indisputably, the defendant is "here," doing business in a large way. The terms of the contracts created "a limited agency in the distributor, under which the latter discharged various obligations for the manufacturer in disposing of its products within the specified area. The distributor was not an independent merchant dealing with the manufacturer upon its own initiative, but conducted its business * * * in conformity with the stipulations contained in the contract." Carroll Electric Co. v. Freed-Eisemann Radio Corp., 60 App.D. C. 228, 50 F.2d 993, 994.

The persistent efforts of foreign corporations to evade service of jurisdictional process in the states has led some courts to suggest the application of a practical test, that where the defendant corporation's local activities justify it, the defendant be drawn from its home state. As in this case, upon the ground of fairness, instead of sending plaintiff to Virginia or Illinois to try its case, bring defendant here. Hutchinson v. Chase & Gilbert, supra; Hurley v. Wells-Newton Nat. Corp., D.C., 49 F.2d 914, 919.

Thirty-nine years ago Judge Hawley, writing the opinion for the 9th Circuit in Denver & R. G. Co. v. Roller, 100 F. 738, said, at page 743, 49 L.R.A. 77: "The general drift and tendency of judicial decisions, state and national, is in the direction of placing corporations upon the same plane as natural persons, in regard to the jurisdiction of suits by or against them.

---

[2] "The Distributor shall conduct his (or its) business in his (or its) own name and upon his (or its) own responsibility, and has no authority whatsoever to bind Alemite in any way, and the Distributor covenants that he (or it) will not hold himself (or itself) out as the agent of Alemite or use the name of 'Alemite' in any manner tending to give the impression that he (or it) represents Alemite in any way whatsoever."

The statutes of the different states and of the United States have, as a general rule, been liberally construed for the purpose of sustaining this view, although the decisions of the state courts upon the precise point under discussion are not entirely harmonious."

If, more than a generation ago, it were thought advisable to place "corporations upon the same plane as natural persons, in regard to the jurisdiction of suits," surely in this day of great corporations and their mass production and intensive universal salesmanship and distribution, there is every reason for the establishment of such a rule.

Under the facts here shown I am of the opinion that the defendant was doing business in the state of California, and service of summons was properly made. International Harvester Co. v. Kentucky, supra; Tauza v. Susquehanna Coal Co., supra; Carroll Electric Co. v. Freed-Eisemann Radio Corp., supra; Hurley v. Wells-Newton Nat. Corp., supra; La Porte Heinekamp Motor Co. v. Ford Motor Co., D.C., 24 F.2d 861; American Asphalt Roof Corp. v. Shankland, 205 Iowa 862, 219 N.W. 28, 60 A.L.R. 986.

California decisions are in line with the holdings of the cases just cited. See Milbank v. Standard Motor Const. Co., 132 Cal.App. 67, 70, 22 P.2d 271.

The motion to quash service will be denied.