## THOMAS *v.* HUDSON SALES CORPORATION
[No. 128, October Term, 1953.]

452

Decided May 20, 1954.

The cause was argued before BRUNE, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Leroy W. Preston,* with whom were *W. Graham Boyce, Jr.* and *Musgrave, Preston and Boyce,* on the brief, for appellant.

*R. Dorsey Watkins,* with whom were *Piper and Marbury* and *E. Clinton Bamberger, Jr.,* on the brief, for appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from an order granting the motion of the appellee, Hudson Sales Corporation, (Hudson Sales), a Michigan Corporation, to quash a writ of attachment.

The short note case was filed against Hudson Motor Car Company, (Hudson Motor), also a Michigan Corporation, to recover an alleged debt of $66,000.00 which the plaintiff, appellant, Graydon Thomas, claims is due and owing him by Hudson Motor for the delivery at Pittsburgh, Pennsylvania, of 12,000 net tons of steel ingots. The writ of summons was issued against Hudson Motor and returned *non est.* A writ of attachment was then served upon the appellee, Hudson Sales, by service upon the Maryland State Tax Commission. The appellee, Hudson Sales, the garnishee, in the attachment case, moved to quash the writ of attachment. From an order

by the trial judge granting that motion on the ground that Hudson Sales was not "doing business" in Maryland the appellant appeals.

For the purposes of this case the facts follow. The appellant, Graydon Thomas, is a resident of the State of Maryland. Hudson Motor is a non-resident corporation and has no place of business in Maryland. Hudson Sales is also a non-resident corporation and claims it has no warehouse, factory, shop, plant, building, or office in this State and maintains no books, records, bank accounts, stocks of goods, automobiles, automobile parts, or merchandise within this State and does no business here. Hudson Motor produces automobiles and parts in Detroit, Michigan. These automobiles and parts are distributed through Hudson Sales with its main office in Detroit, Michigan. Hudson Sales has twenty zone offices throughout the United States and Hudson Motor automobiles, automobile parts and related products are distributed wholesale to authorized Hudson dealers through its twenty offices. The nearest zone office to Maryland is located in Alexandria, Virginia. Sales of new Hudson automobiles and automobile parts and the rendering of specialized Hudson service is done only through authorized Hudson dealers. Hudson Sales claims that it delivers Hudson automobiles, parts and products to dealers in Maryland by delivery to common carriers in Detroit for the account of the dealer and at the dealer's risk. Occasionally automobiles or parts are delivered to Maryland dealers at the zone office in Alexandria. Hudson Sales also claims that payment for deliveries by sales to Maryland dealers is made either in Detroit or in Alexandria. There have been occasions when automobiles have been shipped to Baltimore and paid for in Baltimore through Associates Discount Corporation.

Mr. Frank Burnham, who has been residing in Baltimore County, Maryland, for twenty-five years, has been the District Manager for Hudson Sales for three years. He makes inquiries to determine whether or not an

existing automobile dealer might be interested in becoming a Hudson franchise dealer. He is the only person who solicits franchises in his territory. When applications for franchises are accepted by Mr. Burnham from the prospective dealers, they are sent to the home office for approval or rejection. If approved, they are signed by Mr. C. W. Margetts, Zone Manager, who lives in Virginia. Mr. Burnham explains to the prospective dealers what Hudson requires in the way of buildings and equipment. He states that he had no authority to formally accept a franchise or contract. However, he does not recall any incident where his recommendation for the acceptance of a dealership has been denied. These franchises are usually on a yearly basis with a renewal clause but can be terminated for certain reasons at any time. These franchises require the dealers to promote the sale and service of Hudson products and require them to purchase from Hudson Sales. Hudson Sales extends credit to the dealers as an inducement to enter into a franchise contract. The dealers are required to keep on hand certain parts and a definite number of new Hudson automobiles and a definite number of demonstrators. Eighteen Maryland counties, all of Baltimore City and four or five counties in West Virginia comprise Mr. Burnham's territory. Frequently Hudson dealers contact him at his home in Baltimore County by telephone. The dealers call him whenever the occasion arises. His general duties are to solicit sales of new Hudson automobiles to the dealers and to advise and assist them for the purpose of improving their business and profits. The dealers usually follow Mr. Burnham's recommendations. Most of his time is spent in Maryland. He contacts the dealers in the Maryland counties about once a month and those in Baltimore City perhaps once a week. Sometimes the dealers call Mr. Burnham at his home and ask him to "pick up" certain particular automobiles for the dealers, which he does. Occasionally, automobiles and parts are delivered directly to Maryland dealers at the Alexandria office.

Mr. Andy Miller has been Service Manager for Hudson Sales in the Maryland district for a year and is also a resident of Baltimore County. As the parts serviceman, his duties are to call on the dealers regularly to see that they maintain and stock replacements of spare parts. He sometimes instructs the dealers in the use of new equipment. Also, if the dealers have any service problems, he helps them with those problems at their place of business.

The total amount of business done by Hudson Sales in Maryland is not shown, but one dealer stated that he purchased 750 automobiles yearly at a cost of from $2,500.00 to $2,800.00 each, or at a total cost of approximately two million dollars. Hudson automobiles are advertised extensively in the Baltimore newspapers. Each dealer is required to pay a certain amount into an advertising fund which is kept by Hudson Sales as a separate and distinct account. This money is handled by Hudson Sales, which must approve the spending of the money for advertising paid out of that fund. It sometimes refuses requests of the dealers to spend money for advertising. The dealers to some extent have control over this advertising, but Hudson Sales has the final decision. Certain other features of advertising, Hudson Sales alone takes care of. The participation of Hudson dealers in the annual automobile show held in Baltimore is paid in part by Hudson Sales out of its bank account. About twelve times during the year sales promotion meetings are held in the Belvedere Hotel in Baltimore. The dealers and managers attend these meetings which are conducted by Hudson Sales and the cost of the meetings is paid for by it. The dealers are told what the production schedules are, how many automobiles they can anticipate in future shipments, just what Hudson Sales would like them to sell in order to take care of production, what employees of Hudson Sales are available; and what equipment can be had and used. These meetings are attended by the dealers, Mr. Burnham, and Mr. Margetts, the Zone

Manager, who comes to Maryland three or four times a year. Mr. Vanderzee, a vice-president of Hudson Sales, has attended these meetings on occasions.

Essentially, attachment and garnishment is an action by the defendant against the garnishee for the use of the plaintiff. Therefore the rights of the plaintiff can never rise above those of the defendant. If the defendant cannot sue the garnishee in the courts of the state in which the attachment is filed, the plaintiff cannot do so. 2 *Shinn* on *Attachment and Garnishment,* Sec. 516, page 893; *Hodge & McLane, Attachments,* Sec. 148; *Myer v. Liverpool, London & Globe Ins., Co.,* (1874), 40 Md. 595; *Cole v. Randall Park Holding Co.,* (1953), 201 Md. 616, 623-624, 95 A. 2d 273, 277. The defendant, Hudson Motor, being a non-resident, the appellant, plaintiff below, Graydon Thomas, here is treated as a non-resident. The cause of action as above stated did not arise out of business in this State. Therefore the parts of Article 23, Section 88, 1951 Code, applicable here are "* * * (b) Every foreign corporation doing intrastate or interstate or foreign business in this State shall be subject to suit in this State by a non-resident of this State. * * * (2) provided that the bringing of such suit in this State is not an undue burden upon the defendant or upon interstate or foreign commerce, on any cause of action arising outside of this State."

The first question presented is: Should we consider Hudson Sales as "doing business" in Maryland within the meaning of Section 88(b), supra, and, if so, is the nature of its business in Maryland such as to sustain the suit in Maryland against the constitutional objection that such suit violates the due process clause of the Constitution of the United States?

The Maryland cases are not helpful under the facts in the instant case. *Central of Ga. R. R. Co. v. Eichberg,* (1908), 107 Md. 363; *State v. Penn. Steel Co.,* (1914), 123 Md. 212; *Hieston v. Nat'l. City Bk. of Chicago,* (1918), 132 Md. 389; *Baden v. Washington Loan & T. Co.,* (1919), 133 Md. 602; *Lime Co. v. Wolfenden,* (1937),

171 Md. 299; *Bank v. Meyers & Co.*, (1943), 182 Md. 556; *Davidson Transfer Co. v. Christian*, (1951), 197 Md. 392.

It has been repeatedly held that the mere soliciting and obtaining of orders within a state by an agent of a foreign corporation for goods to be shipped into such state to the purchaser, does not amount to "doing business" within the state, such as to render the corporation subject to service of process therein. *People's Tobacco Co. v. American Tobacco Co.*, 246 U. S. 79, 38 S. Ct. 233, 235, 62 L. Ed. 587; *Bruner v. Kansas Moline Plow Co.*, (C.C.A.), 168 F. 218; Id., 7 Ind. T. 506, 104 S. W. 816; *Lime Co. v. Wolfenden*, 171 Md. *supra.*

It appears that manufacturers of automobiles and other manufacturers who have followed more or less the following pattern in foreign states have been held not to be "doing business" in those foreign states. A foreign corporation which has its principal business in another state, sells its products to distributors outside of that state, and the products are shipped f.o.b. with drafts attached. A district superintendent is employed whose territory includes foreign states. He visits distributors and dealers and advises them how to sell the products, how to keep up their stock of goods, and selects new dealers subject to the approval of the company. All contracts are executed by an officer of the corporation outside of the foreign state, the district superintendent having no authority to finally ratify any contracts. Among cases so holding are *Holzer v. Dodge Bros.*, (1922), 233 N. Y. 216, 135 N. E. 268; *Zimmers v. Dodge Bros.*, (Dist. Ct., Northern Dist., Illinois, 1927), 21 F. 2d 152; *Hinchcliffe Motors, Inc. v. Willys-Overland Motors, Inc.*, (Dist. Ct., Mass., 1939), 30 F. Supp. 580; *Johns v. Bay State Abrasive Products Co.*, (1950), 89 F. Supp. 654; *Harrison, et al. v. Robb Mfg. Co.*, (1953), 110 F. Supp. 848.

However, where corporations have gone beyond that pattern the cases have held that they were "doing business" in the foreign state and that suit there did not

violate the due process clause. In *International Shoe Co. v. State of Washington,* (1945), 326 U. S. 310, 66 S. Ct. 154, 90 L. Ed. 95, 161 A. L. R. 1057, International Shoe, a Delaware corporation, with its principal place of business in St. Louis, Missouri, and engaged in the manufacture of footwear, was sued by the State of Washington for Unemployment Compensation contributions on thirteen salesmen residing in the State of Washington and who were paid by commissions based upon the amount of sales. They were under the direct supervision and control of sales managers located in St. Louis. The corporation had no office in the State of Washington and made no contracts either for sale or purchase of merchandise there. It supplied its salesmen with a line of samples which they displayed to prospective purchasers. On occasion they rented permanent sample rooms for exhibiting samples in business buildings or rented rooms in hotels for that purpose. The cost of such renting was paid by the corporation. The salesmen who solicited the orders forwarded them to St. Louis for acceptance or rejection. When accepted the merchandise was shipped f.o.b. from points outside Washington State to the purchasers within the State and invoiced at the place of shipment from which collection was made. The salesmen had no authority to enter into contracts or to make collections. The Supreme Court of the State of Washington had held that the regular and systematic solicitation of orders resulting in a continuous flow of products into the State, plus the additional activities of the displays in display rooms and the residence of salesmen within the State continuing over a period of years, constituted "doing business" in that State and rendered the corporation amenable to suit there. In affirming the Supreme Court of Washington, Mr. Chief Justice Stone said, among other things: "* * * due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend

'traditional notions of fair play and substantial justice'.
\* \* \* Finally, although the commission of some single
or occasional acts of the corporate agent in a state
sufficient to impose an obligation or liability on the
corporation has not been thought to confer upon the
state authority to enforce it, *Rosenberg Bros. & Co. v.
Curtis Brown Co.*, 260 U. S. 516, 67 L. Ed. 372, 43 S. Ct.
170, other such acts, because of their nature and quality
and the circumstances of their commission, may be
deemed sufficient to render the corporation liable to suit.
\* \* \* It is evident that the criteria by which we mark the
boundary line between those activities which justify
the subjection of a corporation to suit, and those which
do not, cannot be simply mechanical or quantitative.
The test is not merely, as has sometimes been suggested,
whether the activity, which the corporation has seen fit
to procure through its agents in another state, is a
little more or a little less. \* \* \* to the extent that a
corporation exercises the privilege of conducting activi-
ties within a state, it enjoys the benefits and protection
of the laws of that state. The exercise of that privilege
may give rise to obligations, and, so far as those obliga-
tions arise out of or are connected with the activities
within the state, a procedure which requires the corpora-
tion to respond to a suit brought to enforce them can,
in most instances, hardly be said to be undue." This
case has been looked upon as announcing a new principle
in determining whether a corporation was "doing busi-
ness" for the purpose of jurisdiction and that suit in
the foreign state would not violate the due process clause.
Judge Learned Hand in *Bomze v. Nardis Sportswear Co.*,
(C.C.A. 2, 1948), 165 F. 2d 33, 35; Volume 16, *University
of Chicago Law Review* 523; 34 *California Law Review*
331; *Kilpatrick v. Texas & P. Ry. Co.*, (1948), 166 F. 2d
788; *Wooster v. Trimont Mfg. Co.*, (1947), 356 Mo. 682,
203 S. W. 2d 411; *Grace v. Procter & Gamble Co.*, (1948),
95 N. H. 74, 57 A. 2d 619. Compare *Johns v. Bay State
Abrasives Products Co., supra.*

In *Perkins v. Benguet Consolidated Mining Co.*, (1952), 342 U. S. 437, 96 L. Ed. 485, 72 S. Ct. 413, Perkins, a non-resident of Ohio, sued Benguet Consolidated Mining Company, styled a *"sociedad anonima"* under the laws of the Philippine Islands, where it owned and operated gold and silver mines. The suit was for dividends and damages upon causes of action arising from activities of the corporation outside of the State of Ohio. The president and general manager of that Philippine corporation, whose activities there were halted by the war, returned to his home in Ohio where he carried on a continuous and systematic supervision and direction of the corporation's wartime activities. He used local banks for carrying the corporation funds and as transfer agents of its stock. He also held several directors' meetings in an office in his home where he also kept files of the corporation. The president was served in Ohio. The Supreme Court of Ohio had held that the due process clause of the Fourteenth Amendment to the Constitution of the United States prevented Ohio from subjecting this foreign corporation to the jurisdiction of its courts in this action *in personam*. The opinion of the Supreme Court of the United States was written by Mr. Justice Burton. Mr. Justice Black concurred in the result. Mr. Justice Minton and Chief Justice Vinson dissented on the ground that certiorari should not have been issued, as there was no federal question involved even though the state court may have taken an erroneous view of the federal law. That Court, in reversing and holding that the Ohio Court had jurisdiction, in its opinion said: "The essence of the issue here, at the constitutional level, is a like one of general fairness to the corporation. Appropriate tests for that are discussed in *International Shoe Co. v. Washington, supra* (326 U. S. at 317-320, 90 L. Ed. 102-105, 66 S. Ct. 154, 161 A. L. R. 1057). The amount and kind of activities which must be carried on by the foreign corporation in the state of the forum so as to make it reasonable and just to subject the

corporation to the jurisdiction of that state are to be determined in each case."

In *La Porte Heinekamp Motor Co. v. Ford Motor Co.*, (1928), 24 F. 2d 861, the defendant had no factory, warehouse, or office in Maryland. Its factory was in Detroit, Michigan, and various assembling plants were situated throughout the United States where automobiles were put together, the nearest plant being located in Chester, Pennsylvania. It also had a place of business in Washington, D. C. A number of dealers were appointed in Maryland but they did not serve as agents of the company. The automobiles were purchased from the defendant outright and were shipped from Chester on sight draft with bill of lading attached, or, if driven into Maryland, were delivered to dealers upon receipt of check. A sales representative, who did not reside in Maryland, but spent most of his time in Baltimore, solicited prospective dealers to accept franchises. The dealers were appointed by the defendant in Detroit upon recommendation of the branch manager in Chester. Although the dealers were not agents of the defendant, they were required to submit detailed reports. The sales representative had the right to inspect dealers' records and to verify retail orders. He also instructed the dealers in sales management and stimulated sales. Sometimes, when a dealer could not accept a draft, the sales representative tried to get another dealer to accept it and, if successful, would secure a check and deliver it to the bank in payment of the draft. The dealers were called together from time to time to discuss problems of sales, suggestions and distribution. In holding that the defendant did business in Maryland, Judge Soper, then on the District Court, there said: "Summarizing this recital of the relations between the Ford Motor Company and the residents of Maryland, who handle its products, it appears that, while the company does not maintain within the state an agent with power to bind it by contract, nevertheless the actual supervision and control exercised by it through its traveling representa-

tive is almost as complete as if the dealers were its agents in all respects. The privilege of handling Ford cars and other products is evidently valuable, and, since the company may withdraw it at any time, it is not difficult to prevail upon the dealer to comply with the company's demands. The work of the local representative in this connection is of substantial benefit to the defendant. He not only stimulates the dealers to do their utmost in distributing the company's products, but incidentally secures information which enables the company to regulate its output in conformity to the demands of the public. Much of this he accomplishes through an almost daily contact with the various sellers of Ford products within the state; and, when the importance of the problem of distribution in this great business is considered, it becomes clear that the activities of the company within the state, as distinguished from those of the dealers, are not negligible."

It appears in the instant case that the appellee has gone beyond the pattern of immunity, heretofore set out. As in *La Porte Heinekamp Motor Co. v. Ford Motor Co., supra,* while Hudson Motor does not maintain within Maryland an agent with authority to bind it by contract, nevertheless the actual supervision and control exercised by Hudson Sales through its representatives in Maryland is almost as complete as if the representatives of Hudson Sales in this State were the sales department of Hudson Motor for the sale of Hudson automobiles and parts. The privilege of handling Hudson automobiles and parts is evidently valuable. As the franchises are for short periods and as Hudson Sales may withdraw these franchises apparently for many reasons, it is not difficult for Hudson Sales to prevail upon the dealers to comply with its demands. The work of the local representative of Hudson Sales is certainly of substantial benefit to it. By the monthly meetings of dealers, managers, district agents and officers of Hudson Sales at the Belvedere Hotel in Baltimore, the distribution is not only stimulated to dealers but Hudson Sales also secures information which

enables Hudson Motor to regulate its output in conformity with the demands of the public. These monthly meetings amount to practically active management. Mr. Burnham, the district manager, does more than sell new automobiles at wholesale to dealers. He resides in this State, his telephone number is known to the dealers and he is called frequently whenever his advice and services are needed. If Hudson Sales had an office in this State, the service which it would render would hardly be more than that rendered by Mr. Burnham from his home. Through Mr. Burnham, Hudson Sales determines whether a dealer is complying with the requirements of the company franchise and company policy and whether the dealer is conducting his business to the advantage of Hudson Sales. In addition to Mr. Burnham, Mr. Andy Miller, the parts and service representative, who resides in Maryland, is in contact with the dealers and their employees. He demonstrates the use of new tools and equipment for the servicing of Hudson automobiles. Also, if the dealers have any service problems on automobiles after they are sold, he goes to their place of business and helps them with these problems. Furthermore, Hudson Sales actively participates in the annual automobile show held in Baltimore where its products are displayed. Hudson Sales pays part of the cost thereof. This is comparable to the renting of sample rooms for display as in the *International Shoe* case, *supra,* though on a much smaller scale. Hudson Sales also acts as the advertising agent for the dealers and must pass upon all advertising of Hudson automobiles or parts by the dealers. There is also testimony that certain features of advertising are taken care of and paid for by Hudson Sales alone. On rare occasions it appears that automobiles have been paid for in Maryland upon delivery. As stated in the *International Shoe* case, *supra,* by the Supreme Court of the United States, these single or occasional acts of the corporation in this State in accepting payment for automobiles are hardly sufficient to hold that the corporation is "doing business" in Mary-

land, yet the other acts heretofore cited in this paragraph appear sufficient to hold that the corporation is liable to suit here. The exercise by Hudson Sales of the privilege of conducting activities within this State and the benefits and protection of the laws of this State which it enjoys, appear to give rise to the obligations of one who does business here and that it is reasonable and just according to "traditional notions of fair play and substantial justice" to hold that Hudson Sales is "doing business" in Maryland and that suit here does not offend the due process clause. *International Shoe Co. v. State of Washington, supra; Perkins v. Benguet Consolidated Mining Co., supra; Kilpatrick v. Texas & P. Ry. Co., supra; State v. Ford Motor Co.,* (1946), 208 S. C. 379, 38 S. E. 2d 242; *Atlantic National Bank v. Hupp Motor Car Corp.,* (Mass., 1937), 10 N. E. 2d 131; *Wilson v. Hudson Motor Car Co.,* (Dist. Ct. of Nebraska, 1928), 28 F. 2d 347.

The remaining question here involved under Section 88(b)(2), *supra,* is whether under that section suit against the appellee in Maryland would constitute an undue burden upon the appellee or upon interstate or foreign commerce or violate the due process clause and the doctrine of the rule of the forum *non conveniens* which is embodied in this section. See the *Preliminary Report of the Commission on Revision of the General Corporation Laws of Maryland of June 1, 1950;* Article *Maryland Law Review,* Volume III, page 35; *Johns v. Bay State Abrasives Co., supra.*

As above stated, this suit is brought on a cause of action not arising out of the corporation's activity in Maryland. As was said in *International Shoe Co. v. State of Washington,* 326 U. S., *supra,* at pages 316, 317 and 319: "* * * [The demands of due process] may be met by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there. An 'estimate of the inconveniences' which would result to the corporation from a trial away from its 'home' or

principal place of business is relevant in this connection. * * * Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure." See also opinion by Judge Learned Hand in *Hutchinson v. Chase & Gilbert, Inc.,* (2d Cir., 1930), 45 F. 2d 139. *Perkins v. Benguet Consolidated Mining Co., supra.*

As contended by the appellee, this case must be judged as one between Hudson Motor and Hudson Sales. *Cole v. Randall Park Holding Co.,* 201 Md. 616, 626, 95 A. 2d 273, 277, *supra.* We are informed that all the books, records and main offices of Hudson Motor and Hudson Sales are permanently located in Detroit, Michigan, where the officers of the two companies reside. We are also informed that the offices of the two corporations are in the same building in Detroit. The suit therefore is to be judged as one between two people who live in the same house. It appears that some of the records of the transactions between Hudson Motor and Hudson Sales are in Alexandria, Virginia. Furthermore, the short note case is based on a transaction which was consummated in Pittsburgh. If the corporations were not so closely allied, this suit might impose an undue burden on the defendant or upon interstate commerce, such as to violate the due process clause and be very inconvenient to the defendant. For the reasons herein given, the order granting the motion to quash the writ of attachment will be reversed.

> *Order reversed, with costs, and case remanded for further proceedings.*