Charilaos **GKIAFIS**, Appellant,

v.

**STEAMSHIP YIOSONAS, her engines, boilers, boats, tackle, apparel and furniture, and Cia. Nav. Coronado, S. A., Panama, Owners and/or bareboat charterers, Appellees.**

**No. 9586.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 16, 1964.

Decided Feb. 2, 1965.

See also 221 F.Supp. 253.

Henry E. Howell, Jr., Norfolk, Va. (Howell, Anninos & Daugherty, Norfolk, Va., and O'Connor & Preston, Baltimore, Md., on brief), for appellant.

Thomas W. Jamison, III, Baltimore, Md. (Randall C. Coleman, and Ober, Williams & Grimes, Baltimore, Md., on brief), for appellees.

Before SOBELOFF, Chief Judge, and BOREMAN and J. SPENCER BELL, Circuit Judges.

SOBELOFF, Chief Judge.

The question presented is as to the jurisdiction of the District Court over a foreign corporation in a libel filed by a seaman who sustained injuries while a

member of the crew of the corporation's vessel. The injury occurred in the territorial waters of the district. This appeal is from the court's decision quashing service of process and dismissing the libel.

The S.S. YIOSONAS, a vessel owned by the respondent Panamanian corporation, Cia. Nav. Coronado, S.A., and registered under the Greek flag, arrived at the port of Baltimore, Maryland, on September 3, 1961. On September 5, the vessel began loading bulk scrap iron and continued to do so until September 13, when it departed. During this visit the vessel, through a local shipping agent, contracted for tug services, purchased stores and bought over $22,000 worth of bunker fuel.

The libellant, a seaman of Greek nationality, was injured on board the ship sometime on September 5 while the YIOSONAS was in Maryland. He was hospitalized in Baltimore until September 14, 1961. Proceeding under the Jones Act, 46 U.S.C.A. § 688, and "the general admiralty law," he brought a libel for damages, alleging unseaworthiness of the YIOSONAS and the respondent's negligence.

The vessel is operated as a tramp steamer with no scheduled route. She is leased to voyage charterers who determine her destination. Instructions from various charterers brought the YIOSONAS to Maryland four times before the visit in question: January 13 to January 21, 1953; July 25, 1953; August 6 to August 15, 1955; and September 18 to September 19, 1955. The ship also visited Maryland once after the accident, to discharge cargo on May 23, 1962.

Jurisdiction over the respondent ship-owner, Coronado, was purportedly ob-tained by serving process on the Department of Assessments and Taxation pursuant to Maryland Code Ann. Art. 23, § 92(b) (1957). Coronado, appearing specially, filed a motion to quash service of process and to dismiss the libel on the ground that neither at the time of the service nor at any subsequent time had it been "doing business" in the state of Maryland, or qualified to do business there. Respondent also contended that the provisions of the Maryland Code providing for substituted service of process are constitutionally inadequate because they are not reasonably calculated to insure actual notice to a foreign corporation.

## I

The jurisdiction of a court over a defendant foreign corporation is tested in the federal courts by a motion attacking the service of process. This indirect approach to questions of jurisdiction is understandable in the federal courts since there is no statutory provision which informs the courts when foreign corporations "are amenable to process so that in personam jurisdiction may be had over them in diversity and most non-diversity suits." Note, Jurisdiction of Federal District Courts over Foreign Corporations, 69 Harv.L.Rev. 508 (1956). Consequently, federal judges attempting to fill this statutory void have held that a federal court can obtain jurisdiction over a foreign corporation only when it is constitutionally and statutorily permissible to serve the corporation.

In federal courts service is generally made pursuant to the provisions of Rule 4 of the Federal Rules of Civil Procedure. For a plaintiff seeking to bring a corporation into a federal court the rule offers the federal route under Rule 4(d) (3) [1]

---

1. Rule 4(d): " * * * Service shall be made as follows:

    \*    \*    \*    \*    \*

"(3) Upon a * * * foreign corporation * * * by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant."

or the state route under Rules 4(d) (7) [2] and (e).[3] The libellant in this case has chosen to proceed as under Rule 4(d) (7),[4] having attempted to utilize the substituted service provisions of the Maryland Code.

Recent decisions have held that the assertion of jurisdiction over foreign corporations by federal courts considering federal questions is limited only by the due process clause of the Fifth Amendment. Lone Star Package Car Co. v. Baltimore & Ohio R. Co., 212 F.2d 147 (5th Cir. 1954); Goldberg v. Mutual Readers League, Inc., 195 F.Supp. 778 (E.D.Pa.1961). See Green, Federal Jurisdiction In Personam of Corporations and Due Process, 14 Vand.L.Rev. 967 (1961). This approach rejects the argument made in this case by the shipowner that jurisdiction may be asserted only where the statutes of the forum state permit. In the cited cases it was possible to disregard state limitations on jurisdiction because in each instance service was made pursuant to the provisions of Rule 4(d) (3) on an agent of the corporation present in the forum state. Problems of applicable law become more complex when there is no such agent in the forum state, or, if there is one, he has not been served. In such cases a federal court may have the constitutional power to exercise jurisdiction over the corporation but there is no procedure available to bring it into court by process without resort to the mechanics of state law. See Arrowsmith v. United Press International, 320 F.2d 219, 242 (2d Cir. 1963) (Clark, J., dissenting). An anomaly in this approach is that the jurisdiction of federal courts dealing with federal questions will vary from state to state. Some plaintiffs will be unable to obtain service on foreign corporations while such service would be available to similarly situated plaintiffs in federal courts sitting in other states. United States v. Montreal Trust Co., 35 F.R.D. 216 (S.D.N.Y.1964). This happens when the cause of action is brought in a federal court located in a state that is more conservative in its statutes governing service of process than is constitutionally necessary. This anomaly causes no difficulty here for we find, contrary to the view taken by the District Court, that Maryland law authorizes the service attempted in this case.

The contact of the respondent with Maryland consisted of its ship's six unscheduled visits in a nine year period, one visit marked by the events giving rise to the libel in this case. The statutory provisions relied on by the libellant to authorize service in such a case read as follows:

"Every foreign corporation doing intrastate or interstate or foreign

---

2. Rule 4(d): " * * * Service shall be made as follows:

  * * * * *

  "(7) Upon a defendant of any class referred to in paragraph * * * (3) of this subdivision of this rule, it is also sufficient if the summons and complaint are served * * * in the manner prescribed by the law of the state in which the district court is held * * *."

3. Rule 4(e): "Whenever a statute * * * of the state in which the district court is held provides (1) for service of a summons, or of a notice, or of an order in lieu of summons upon a party not an inhabitant of or found within the state * * * service may * * * be made under the circumstances and in the manner prescribed in the statute or rule."

4. The libellant alleges that he is proceeding under the Jones Act, 46 U.S.C.A. § 688, a federal law, and therefore jurisdiction is asserted under 28 U.S.C.A. § 1331. He also invokes the admiralty jurisdiction under 28 U.S.C.A. § 1333. If the action is properly brought under the former, the Federal Rules of Civil Procedure govern; if under the latter, the Admiralty Rules, rather than the Civil Rules, apply. There is no express sanction in the Admiralty Rules for obtaining service by following state procedure. However, admiralty practice in regard to the adoption of local law to obtain service of process is substantially the same as that permitted under Civil Rule 4(d) (7). Patel Cotton Co. v. The Steel Traveler, 107 F.Supp. 191 (S.D.N.Y. 1952); see 2 Benedict, Admiralty § 280 (1940).

business in this State shall be subject to suit in this State by a nonresident of this State, (1) on any cause of action arising out of such business * * *." Md.Code Ann. Art. 23, § 92(b) (1957).

"If * * * any foreign corporation subject to suit in this State under § 92 of this article, (1) has not a resident agent, * * * such corporation shall be conclusively presumed to have designated the Commission as its true and lawful attorney authorized to accept on its behalf service of process * * *." Md.Code Ann. Art. 23, § 96(d) (1957).

The shipowner argues, and the District Court held, that the "doing business" test set out in this statute is to be read as meaning *"regularly* doing business." We conclude, after reviewing the history of this provision, that the District Court's reading of this section is too restrictive.

Anyone attempting to unravel the intricacies involved in a state's assertion of jurisdiction over foreign corporations will soon discover that much unnecessary confusion stems from the occasional injudicious use by courts and legislatures of the phrase "doing business." Judge Haynsworth voiced this complaint for our court in Westcott-Alexander, Inc. v. Dailey, 264 F.2d 853, 856–857 (4th Cir. 1959). Many state legislatures define the scope of their courts' jurisdiction in terms of whether a foreign corporation is "doing business" in that state. This phrase may be defined in several different ways. It could refer to that body of constitutional law, then described as the "doing business" test, that was controlling before the Supreme Court's decision in International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L. Ed. 95 (1945). The standard resulting from such a static interpretation compels the disregard of the constitutional doctrine declared in that decision. Some states have so construed this phrase.[5]

Another possible reading of a state's use of the "doing business" standard is that the legislature intended to adopt a flexible measure that would be as expansive and dynamic as the due process clause of the Fourteenth Amendment will reasonably permit.[6] The choice is the state's; it is our task to determine what meaning the Maryland General Assembly intended to adopt. Perkins v. Benguet Consolidated Mining Corp., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

The earliest statute permitting suits in Maryland courts against foreign corporations was passed in 1868.[7] It provided that any foreign corporation that "shall transact business" in Maryland shall be deemed to hold "franchises within this State," and a resident plaintiff could bring suit against any corporation "deemed to hold and exercise franchises herein" or against "any joint stock company or association doing business in this State." Nonresident plaintiffs could sue such defendants if the cause of action arose in Maryland. This statute incorporated the thinking and terminology of a then recent Supreme Court decision to the effect that a state could condition its grant of permission to a foreign corporation to "transact business" in that state upon the foreign corporation subjecting itself to the jurisdiction of the state's courts. Lafayette Ins. Co. v. French, 18 How. 404, 59 U.S. 404, 407, 15 L.Ed. 451 (1855); see also St. Clair v. Cox, 106 U.S. 350, 1 S.Ct. 334, 27 L.Ed. 222

---

5. See Jennings v. McCall Corporation, 320 F.2d 64 (8th Cir. 1963) (Mo.); Ark-La Feed & Fertilizer Co. v. Marco Chemical Co., 292 F.2d 197 (8th Cir. 1961) (Ark.); Mississippi Wood Preserving Co. v. Rothschild, 201 F.2d 233 (5th Cir. 1953) (Miss.); Petroleum Financial Corp. v. Stone, 111 F.Supp. 351 (S.D.N.Y.1953) (N.Y.).

6. For cases interpreting state statutes to have such a meaning, see Walker v. General Features Corp., 319 F.2d 583 (10th Cir. 1963) (Okla.); Moore-McCormack Lines, Inc. v. Bunge Corp., 307 F.2d 910 (4th Cir. 1962) (Va.); Sanders Associates, Inc. v. Galion Iron Works & Mfg. Co., 304 F.2d 915 (1st Cir. 1962) (N. H.).

7. Laws of Maryland, ch. 471, § 409 (1868).

(1882). The Maryland Court of Appeals, construing this provision, held that "the object of the statute was not to restrict, but to enlarge, the jurisdiction of our courts over foreign corporations doing business in the state * * *." Fairfax Forest Mining & Manufacturing Co. v. Chambers, 75 Md. 604, 23 A. 1024, 1026 (1892). In its opinion the court used the phrases "doing business" and "transacting business" interchangeably.[8] In time the former phrase was accepted as the term of art describing how much activity a foreign corporation must do in a state before it could be deemed to be "present" there or to have "consented" to appointment of the Secretary of State as its agent to receive service of process. See Conley v. Mathieson Alkali Works, 190 U.S. 406, 411, 23 S.Ct. 728, 47 L.Ed. 1113 (1903). In 1908 (Laws 1908, p. 50) the new terminology was adopted by the Maryland legislature when it permitted "Any person or corporation, whether a resident or nonresident of this State, [to] sue any foreign corporation regularly doing business * * * herein for any cause of action." Nonresidents were thus allowed to bring suit against foreign corporations in all cases where a resident plaintiff could do so. The Maryland legislature was again extending the jurisdiction of its courts to the maximum deemed constitutionally permissible at that time.

The textual addition of the word "regularly" to the test did not reduce the jurisdition of the Maryland courts since it was the universal belief at that time that a state could assert jurisdiction over a foreign corporation only if that corporation regularly conducted business in the state. Central of Georgia Ry. Co. v. Eichberg, 107 Md. 363, 68 A. 690, 693, 14 L.R.A., N.S., 389 (1908); see Issacs, An Analysis of Doing Business, 25 Col.L.Rev. 1018, 1028 (1925); Cooper Mfg. Co. v. Ferguson, 113 U.S. 727, 5 S.Ct. 739, 28 L.Ed. 1137 (1885) (qualification); Hunaw v.

Northern Region Supply Corp., 262 F. 181 (S.D.N.Y.1920).

In 1925 the Court of Appeals was called upon to apply the new wording to a foreign corporation that sailed its tramp steamers into Maryland on a non-scheduled basis, the cause of action not having arisen in Maryland. The court ruled that service on this corporation was void because it was not doing business regularly in Maryland.

> "The word 'regularly' ordinarily implies uniformity, continuity, consistency, and method, and excludes the idea of an occasional, accidental, incidental or casual use, and it must have been intended that it should have that meaning in the statute, because its obvious purpose is to qualify, narrow and limit the meaning of the phrase 'doing business,' * * *." Carter v. Reardon-Smith Line, 148 Md. 545, 558, 129 A. 839, 844 (1925).

Maryland's highest court thus read the word "regularly" as having been added to the statute, as it then was, to exclude the "occasional, accidental, incidental or casual" visit.

In 1937 the General Assembly again amended the service of process provisions of the Maryland Code. Among other changes was one of particular relevance to this case. The word "regularly" was dropped and the phrase "doing business" was left unmodified by that or any equivalent term. Laws of Maryland, ch. 504, § 118(b) (1937). This change was not inadvertence but calculated precision on the part of the lawmakers. They added an interpretative section to the new legislation as an aid to the courts in its application:

> "Be it enacted by the General Assembly of Maryland, That the provisions of this Act, so far as they are substantially the same as existing statutes, shall be construed as continuations thereof, and as intended

---

8. Curiously enough the term "transacting business," as it is used in the venue provisions of the Clayton Act, is today held to be a more permissive standard than

the "doing business" test. Gem Corrugated Box Corp. v. Mead Corp., 189 F. Supp. 584 (S.D.N.Y.1960).

to make no substantive change in existing laws, except in so far as such change shall be clearly manifest, and no implication of change of intent shall arise by reason of a change of words or phraseology or by reason of a relocation or rearrangement of sentences, phrases, sections or paragraphs except so far as such change of intent shall be clearly manifest." Laws of Maryland, ch. 504, § 1 (1937).

The deletion of a term theretofore deemed to be of controlling importance by the Maryland Court of Appeals is a change that is "clearly manifest" and we construe it as making a substantive change in the law. This was no mere stylistic substitution of terms, but the deliberate expunging of a modifier the potency of which the court had authoritatively declared.

▇ In its task of construing a statute a court is no more free to interpolate a word that the legislature has removed by amendment than it would have been warranted in ignoring that word before the amendment was made. Especially is this true if the word removed has a history of judicially established significance.

We fully share the District Court's approval of Professor Reiblich's view that "the cases interpreting the old statute indicated an intention in the statute to assert power as fully as the limits of due process of law allowed." Reiblich, Jurisdiction of Maryland Courts over Foreign Corporations under the Act of 1937, 3 Md.L.Rev. 35, 44 (1938). The insertion of the word "regularly" in the 1908 statute had, however, removed the desired flexibility of the test by tying the standard to that point in time when jurisdiction could be asserted only over a foreign corporation that was *regularly* doing business in the forum state. Professor Reiblich was also correct in stating that the deletion of the adverb did not "effect any change in the corporations to be covered thereby," *ibid.*, meaning that no immediate change in coverage was effected.

The sense of what he was saying was that the General Assembly was releasing the standard from the moorings of its specific wording and casting it adrift on the tide of constitutional due process. A foreign corporation engaging in sporadic contacts with the state in 1937 might be immune under the due process decisions then controlling, but that does not mean that the immunity would remain as theretofore fixed. If the Supreme Court should find that regularity of contacts was no longer a constitutional prerequisite to the assertion of jurisdiction it would no longer be a required test in Maryland.

Another indication that the General Assembly meant to extend the jurisdiction of its courts to the constitutional limit is found in another provision of the 1937 Act. Decisions of the Supreme Court had only recently indicated that the performance of a single act in the forum state by a nonresident was a sufficient contact with that state if the act had given rise to the cause of action by a resident. Doherty & Co. v. Goodman, 294 U.S. 623, 55 S.Ct. 553, 79 L.Ed. 1097 (1935); Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927); Reiblich, Jurisdiction of Maryland Courts over Foreign Corporations under the Act of 1937, 3 Md.L.Rev. 35, 67 (1938). The General Assembly expanded this new concept even further by permitting Maryland residents to bring suit against either nonresident individuals *or* corporations on any cause of action arising out of an act done in Maryland "whether or not such foreign corporation is doing or has done business in this State." Laws of Maryland, ch. 504, § 118(d) (1937).

The permissive scope of the due process clause of the Fourteenth Amendment was widened appreciably in 1945 when the Supreme Court held that the Constitution required that a foreign corporation have only such minimum contacts with the forum state that maintenance of the suit would not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. State of Washington,

326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

This decision posed a dilemma for the Maryland courts. The constitutional test was now expressed in terms of "minimum contacts" rather than "doing business." The question facing the courts was whether the General Assembly used the phrase "doing business" as a convenient abbreviation of the constitutional test whatever it might be, or was it designed to confine the courts' jurisdiction within the limits as defined when "doing business" was understood to be the constitutional test.

The answer was suggested in Thomas v. Hudson Sales Corp., 204 Md. 450, 105 A.2d 225 (1954). This was a garnishment proceeding treated by the court as a suit by a nonresident against the Hudson Sales Corp., a foreign corporation, which had an agent in Maryland. While this agent had no authority to bind his employer by contract he did exercise almost complete control over sales franchises located in Maryland. Such activity was sufficient to satisfy the "doing business" test as it had evolved before International Shoe and the Court of Appeals cited cases to that effect. Atlantic National Bank v. Hupp Motor Car Corp., 298 Mass. 200, 10 N.E.2d 131 (1937); Wilson v. Hudson Motor Car Co., 28 F.2d 347 (D.Neb.1928); La Porte Heinekamp Motor Co. v. Ford Motor Co., 24 F.2d 861 (D.Md.1928). Judge Collins went further, however, and indicated that the "doing business" test of the Maryland statute was to be read as broadly as the standard laid down in International Shoe. Describing the Supreme Court's decision, he said it is "looked upon as announcing a new principle in determining whether a corporation was 'doing business' for the purpose of jurisdiction * * *." Thomas v. Hudson Sales Corp., 204 Md. 450, 460, 105 A.2d 225, 229 (1954). The opinion went on to comment that:

> "The exercise by Hudson Sales of the privilege of conducting activities within this State and the benefits and protection of the laws of this State which it enjoys appear to give rise to the obligations of one who does business here and that it is reasonable and just according to 'traditional notions of fair play and substantial justice' to hold that Hudson Sales is 'doing business' in Maryland and that suit here does not offend the due process clause." Supra at 465, at 231, of 105 A.2d.

Judge Parker, for our court, after reviewing the history of the statute, has construed this dictum to mean that the Maryland "doing business" test and due process test set forth in International Shoe are identical. He commented that such a reading of the statute was

> "in accord with the spirit of the statute, which is to extend the jurisdiction of the Maryland courts over suits by citizens of the state or contracts made within the state as far as constitutionally possible." Kahn v. Maico Company, 216 F.2d 233, 237 (4th Cir. 1954) (dictum).[9]

We reaffirm that statement as it applies to this case, amending it by adding to this category torts committed in the state.[10]

The only Maryland case cited by the respondent in support of its proposition

9. Md.Code Ann. Art. 23, § 92(b) (1957), applies the "doing business" test to "any cause of action arising out of such business" so there is no reason to distinguish between contract actions arising out of such business and tort actions of comparable origin.

10. The District Court places reliance on Md.Code Ann. Art. 23, § 88(b) (1957), which states that a foreign corporation "shall not be considered to be doing intrastate business * * * by reason of * * * (6) Conducting an isolated transaction not in the course of a number of transactions of like nature," to support its holding that Maryland requires a foreign corporation to have regular contacts with the state before jurisdiction will be asserted. Assuming this definition to be analogous, it would seem that it does not exclude this case, since a "course" is a "manner or way of conduct." Webster's New Int. Dictionary, 610, c. 3 (1957 ed.). All of the visits were conducted in the same way and were intended to achieve the same result.

that the Maryland "doing business" test does not cover this case is Chesapeake Supply & Equipment Co. v. Manitowoc Engineering Corp., 232 Md. 555, 194 A.2d 624 (1963). The language relied on is as follows:

> "The general rule is that a foreign corporation is doing business within a state when it transacts some substantial part of its ordinary business therein." Id. 194 A.2d at 627 at 562, 627.

The quote indicates no requirement of regularity nor does it indicate that Maryland has adopted a stricter test than that prescribed in International Shoe. The rule as stated is the rule of International Shoe in cases where the cause of action arose outside the forum state. Such being the character of the case before it, the Court of Appeals was not addressing itself to the problems here under consideration.

In a more recent opinion, where jurisdiction was taken over a foreign corporation doing 2% of its business in Maryland, the Court of Appeals again indicated that the Maryland rule takes its guide from the most recent Supreme Court decisions. While that case is factually distinguishable from ours, the thrust of the decision and its relevance for our purposes are highlighted by Judge Henderson, who, dissenting from the majority, said:

> "I see no reason why this Court should depart from its established views as to what constitutes doing business, simply because the Supreme Court of the United States has limited the constitutional immunity from suit once afforded to those engaged in commerce between the states." White v. Caterpillar Tractor Co., 235 Md. 368, 375, 201 A.2d 856, 859 (1964).

In addition, as will be shown below, "some substantial part of" our shipowner's ordinary business was done in Maryland.

While the District Judge's reading of the Maryland law, thus far not authoritatively interpreted, is by no means logically untenable, we think that the view here expressed is more in accord with the spirit of the legislation and its probable interpretation by the Maryland Court of Appeals.

■ We therefore interpret Maryland law to authorize substituted service of process on a foreign corporation which has sent its only ship into the state six times to engage in that corporation's ordinary business activity if the assertion of such jurisdiction is constitutionally permissible.[11]

## II

■ In determining whether the facts of this case are within the constitutionally permissive limits of the due process clause we find ourselves confronted with another anomaly—the Fourteenth Amendment could operate to limit the jurisdiction of a federal court considering a federal question. First Flight Co. v. National Carloading Corp., 209 F.Supp. 730 (E.D.Tenn.1962); see Jaftex Corporation v. Randolph Mills, Inc., 282 F.2d 508, 516 (2d Cir. 1960) (Friendly, J., concurring). Fortunately again, the anomaly is resolved in this case since an assertion of jurisdiction by Maryland over the respondent would be well within the state's constitutional power.

Excessive preoccupation with labels has unfortunately introduced a measure of confusion in the application of the Fourteenth Amendment's due process clause to the states. We have seen that the evolution of the theories explaining and rationalizing a state's power to assert judicial jurisdiction over foreign corporations has been a succession of fictive formulas—consent, presence, and doing business. These terms have all been dis-

---

11. The fact that the respondent's ship visited Maryland at the direction of its charterer was held by the District Court to be of no significance and we agree. See Hoodye v. Bruusgaard Krosterud Skibs A/S Drammen, Norway, 197 F.Supp. 697 (S.D.Tex.1961); Arpad Szabo v. Smedvig Tankrederi A.S., 95 F.Supp. 519, 522 (S.D.N.Y.1951).

carded by the Supreme Court.[12] Many courts, however, have continued to use the phrase "doing business" when describing the limits of the due process clause, and, what is worse, have continued to use the old tests that grew up when that phrase summarized the current thought as to the constitutional limits of state court jurisdiction over foreign corporations. In some instances no harm is done by the literal application of the old cases, for example, where the cause of action arose outside the state and the only question was the volume of business done in the state.

Harm is done, however, when more is at issue than the quantum of commercial activity of the foreign corporation in the state. It was such instances that prompted Chief Justice Stone to articulate a new standard of due process in International Shoe, a standard that focused on the totality of the circumstances in each particular case. Courts were directed in the future to consider, in addition to the quantity of the contacts, their "quality and nature" and their connection with the obligation sued on.

It is necessary to scrutinize decisions holding that a foreign corporation is "doing business" in a state only if its contacts with that state are regular. They are correct, of course, as descriptions of the pre-1945 due process test. They are incorrect, however, if they are understood to set up regularity of contacts as a constitutional prerequisite in all cases.

■ The Supreme Court in International Shoe indicated that a single contact giving rise to a cause of action may be sufficient to warrant a state's assertion of jurisdiction over a foreign corporation:

"Finally, although the commission of some single or occasional acts of the

corporate agent in a state sufficient to impose an obligation or liability on the corporation has not been thought to confer upon the state authority to enforce it * * * other such acts, because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit. * * * [T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. *The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.*" International Shoe Co. v. State of Washington, 326 U.S. 310, 318–319, 66 S.Ct. 154, 159–160, 90 L.Ed. 95 (1945) (Emphasis added).

This concept was fully embraced twelve years later when state jurisdiction was sustained over a foreign corporation whose contact with the forum state was limited to the issuance of a single insurance policy to a resident of that state. "It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State." McGee v. International Life Insurance Co., 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957).[13]

■ These two Supreme Court cases clearly show that a finding of regular contacts with the forum state is not an indispensable predicate to the assertion of jurisdiction. The regularity test applies only when the commercial contact is in-

---

12. "In a continuing process of evolution this Court accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations." McGee v. International Life Insurance Co., 355 U.S. 220, 222, 78 S. Ct. 199, 200, 2 L.Ed.2d 223 (1957).

13. Citing with approval Smyth v. Twin State Improvement Co., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193 (1951), where the foreign corporation entered Vermont only once, but that visit gave rise to the cause of action, a physical injury, and jurisdiction was upheld.

significant in itself and the cause of action did not arise therefrom. We therefore turn to a consideration of the significance of the commercial contacts and the origin of the cause of action in the instant case.

First, the "quality" of the contacts must be considered, that is, their importance to the corporation and their commercial impact on the state.[14] The respondent owned only one ship. When that ship entered Maryland the respondent was doing all of its business there. Such contacts then are of weightier significance than visits by one of many ships owned by a corporation that is doing most of its business elsewhere.[15]

While in Maryland the ship loaded or unloaded large and valuable cargoes, and the owner supplied sizable quantities of fuel and stores, hired tugs and contracted for berths. The visits were thus significant both to the respondent and to the state.

■ Second, the locus of the cause of action is to be considered. By now it is certainly beyond question that an otherwise insignificant contact with a state may prove constitutionally sufficient if it gave rise to the cause of action involved in the particular suit. McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Anderson v. Penncraft Tool Co., 200 F.Supp. 145 (N.D.Ill.1961); Nelson v. Miller, 11 Ill.2d 378, 143 N.E.2d 673 (1957); Smyth v. Twin State Improvement Co., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193 (1951).[16] While the plaintiffs in the above cited cases were residents of the forum states no case has made this the determinative factor. Many of the reasons that justify the taking of jurisdiction where the plaintiff is a resident are fully applicable to the case of the present libellant.[17]

---

14. The Supreme Court has recently pointed out that the threshold question in jurisdiction cases is the significance of the defendant's contacts with the forum state. "However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him." Hanson v. Denkla, 357 U.S. 235, 251, 78 S. Ct. 1228, 1238, 2 L.Ed.2d 1283 (1958); see also Blount v. Peerless Chemicals (P.R.) Inc., 316 F.2d 695 (2d Cir. 1963), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62 (1963); Note, 75 Harv. L.Rev. 1431 (1962).

15. See Arpad Szabo v. Smedvig Tankrederi A.S., 95 F.Supp. 519, 521–522 (S.D. N.Y.1951) (Weinfeld, J.) :
    "While a number of cases place emphasis on the frequency and regularity with which a vessel calls at a port, * * * this is a relative factor, depending upon the nature of the voyages and the extent of operations. In this case, for example, the defendant's sole business consists of the operation of the vessel on which plaintiff was injured and one other, and so it would appear that a very substantial portion of its business and activities is carried on for and on behalf of defendant within this state."

See also Neset v. Christensen, 92 F.Supp. 78 (E.D.N.Y.1950).

16. See Seawind Compania, S. A. v. Crescent Line, Inc., 320 F.2d 580, 583 (2d Cir. 1963) :
    "What respondent-appellee's volume of business may lack under ordinary tests, however, appellant supplies by the nature of its claim. The contract in suit was made and allegedly breached by Crescent Lines in New York. For such activities respondent-appellee could clearly be made subject to suit in New York * * *."
See also Kourkene v. American BBR, Inc., 313 F.2d 769, 773 (9th Cir. 1963); L. D. Reeder Contractors of Ariz. v. Higgins Industries, Inc., 265 F.2d 768 (9th Cir. 1959); Developments in the Law—State-Court Jurisdiction, 73 Harv.L.Rev. 909, 926 (1960).

17. See Blount v. Peerless Chemicals (P. R.) Inc., 316 F.2d 695, 697, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (2d Cir. 1963), cert. denied, 375 U.S. 831, 84 S.Ct. 76, 11 L. Ed.2d 62 (1963) :
    "[T]he state has an interest in subjecting to its judicial process a corporation whose activities in that state expose its residents to a risk of physical harm or economic loss; the state's interest in regulating such objection-

In both situations the state has an interest in discouraging negligent conduct within its borders. The deference due to a state's desire to protect its own residents needs no explanation. By discouraging negligent conduct within its borders not only nonresidents but residents too are afforded greater protection. In some ways, however, the interest of a state in the welfare of nonresidents injured within its borders is stronger. An injured resident can look to friends and relatives in the community to help him through the financial and emotional difficulties that accompany a physical injury. He may more readily obtain assistance in meeting medical bills and find a friendly home during the recuperative period. This is not so often the case when injury happens to a nonresident, particularly an alien. Not only is such a person less likely to have outside resources at his call, but barriers of language and custom may handicap him in getting a job to support himself and discharge financial obligations incurred within the state. The chances of his becoming a public charge and failing to pay his local creditors are increased.

The locus of the accident has relevance also because it is usually the most convenient place to adjudicate the factual and legal issues arising therefrom. This consideration retains its force regardless of the residence of the plaintiff. Its weight may be reduced when the accident occurs aboard a vessel that has since left the forum but it is still relevant, for the doctors who treated the injury often are to be found there. In addition the applicable law in many cases will be that of the forum state.

The emphasis the shipowner puts on the irregularity of the YIOSONAS' visits to Maryland is misconceived. Its position is that it is not regularly doing business in any port since it has no scheduled stops. A similar argument was addressed to the Supreme Court of North Carolina by the owner of a tramp steamer that had made only one visit to the state, that visit having resulted in the property damage giving rise to the suit. The court held that the defendant was "doing business" in the state even under the pre-International Shoe law. It noted that although the ship was not scheduled to return, it would do so

"as often as it could obtain a cargo. Under the construction of the statute contended for by the appellant, the Severence might ply its trade in every port from Seattle to Bangor and back again, leaving a trail of obligations in its wake, and never 'do business' in any state, or become subject to any statute designed to bring it into court upon that basis." State Highway and Public Works Commission v. Diamond S.S. Transp. Corp., 225 N.C. 198, 34 S.E.2d 78, 81 (1945.)[18]

Cases holding tramp steamers to lack sufficient contact with a particular port are readily distinguishable. In some the shipowner operated a large number of vessels that never came to the port,[19] in others the cause of action arose outside the forum state,[20] and in still others the

---

able conduct within its borders is apparent even though the plaintiff may be a nonresident * * *."

18. Contrast this case with one where the ship was forced into the state by adverse weather conditions. In such a situation it was held that the shipowner was not "doing business" in that state because it had not entered the state in the course of its regular business. United States v. Tug Parris Island, 215 F.Supp. 149 (E.D.N.C.1963).

19. Wingert v. Navarie Aznar, S.A. Bilbao, 196 F.Supp. 585 (D.Or.1961) (30).

20. Alcaldé v. The Los Mayas, 184 F.Supp. 873 (E.D.Va.1960); Higgins v. California Tanker Co., 166 F.Supp. 569 (E.D. Pa.1957); Novitski v. Lykes Steamship Co., 90 F.Supp. 971 (E.D.Pa.1950); L. H. Hamel Leather Co. v. Steamship City of Auckland, 1957 A.M.C. 89 (D.Mass. 1948) (The opinion made no reference to any case decided after 1941).

court was applying a restrictive state test.[21]

 We therefore hold that the respondent was amenable to service under the provisions of both the Maryland Code and the federal Constitution.

## III

 The respondent also challenges the constitutionality of Maryland Code Annotated, Art. 23, §§ 97 & 98 (1957), under which the service was made in this case. It is contended that the procedure there provided is not reasonably calculated to insure notice to the defendant since there is no requirement that there be a return receipt of the registered letter by which the respondent is to be notified. This argument was rejected in Speir v. Robert C. Herd & Co., 189 F. Supp. 432 (D.Md.1960). After a thorough and learned examination of the questions involved Judge Thomsen upheld the constitutionality of the Maryland procedure. We share Judge Watkins' approval of the reasoning of that decision and affirm his holding that the notice provisions of the Maryland substituted service procedure are adequate.[22]

 The libel initiating this suit was originally filed in Virginia, and the jurisdictional allegation was only that the respondent was doing business in Virginia. Later, the libellant moved for the transfer of the case to Maryland. The asserted ground for the motion was:

"[T]hat the libellant suffered his injuries and obtained hospitalization in the port of Baltimore and it would be more convenient to subpoena his witnesses in the District Court at Baltimore, Maryland, than in this Honorable Court, and he would be able to sustain venue of his action in the port of occurrence * * *."

However, after transfer the libellant neglected to amend the libel to allege that the respondent was doing business in Maryland. As the case will be remanded to the District Court for a hearing on the merits, an appropriate amendment may be made in that court. Fed.R.Civ.P. 15; see 3 Moore, Federal Practice, § 15.09 (1963).

Remanded for further proceedings consistent with this opinion.

---

**21.** Rutter v. Louis Dreyfus Corp., 181 F. Supp. 531 (E.D.Pa.1960); Wade v. Romano, 179 F.Supp. 72 (E.D.Pa.1959).

**22.** See National Equipment Rental v. Szukhent, 375 U.S. 311, 315, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964), where Justice Stewart indicated that the actual receipt of notice will moot questions of its adequacy when service is made pursuant to Federal Rule of Civil Procedure 4(d)(1). Quaere whether this reasoning applies when a state service procedure is used for federal purposes pursuant to Federal Rule of Civil Procedure 4(d)(7).