637 A.2d 1183

TILLER CONSTRUCTION CORPORATION

v.

Ronald NADLER, et al.

No. 126, Sept. Term, 1993.

Court of Appeals of Maryland.

March 7, 1994.

Yale L. Goldberg, Bethesda, for appellant.

Herbert S. Rosenblum, Rosenblum and Rosenblum, Alexandria, VA, David Kopstein, Dross Levenstein Perilman & Kopstein, Washington, DC, all on brief, for appellee.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, ROBERT M. BELL and RAKER, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

CHARLES E. ORTH, Jr., Judge, Specially Assigned.

## I

"Foreign Corporation" means a corporation, association, or joint-stock company organized under the laws of the United States, another state of the United States, a territory, possession, or district of the United States, or a foreign country.

Maryland Code (1975, 1993 Repl.Vol.) § 1–101($l$) of the Corporations and Associations Article.[1]

Before doing any intrastate business in this State, a foreign corporation shall qualify with the [State] Department [of Assessments and Taxation].

---

1. Reference to a section or subsection hereinafter is to the Corporations and Associations Article of the Maryland Code (1975, 1993 Repl.Vol.) unless otherwise indicated.

Section 7–203(a). Subsection (b) spells out the manner of qualification. Section 7–101(a) concerns who may register in this state.

A corporation which is registered or qualified under this subtitle [7, "Foreign Corporations"] may obtain a certificate of registration or qualification from the Department. The certificate shall show the address of any principal office in this State which is certified to the Department.

Section 7–204. Certain activities of a foreign corporation that do not constitute doing intrastate business in this State, "[i]n addition to any other activities which may not constitute doing intrastate business in this State," are designated in § 7–103. One of them is

[c]onducting an isolated transaction not in the course of a number of similar transactions.

*Id.,* subsection (7). *See also* § 7–104.

By doing intrastate, interstate, or foreign business in this State, a foreign corporation assents to the laws of this State.

§ 7–105.

The failure of any foreign corporation to comply with any of the requirements of Subtitle 2 of this title ["Registration and Qualification of Corporation"] does not affect the validity of any contract to which the corporation is a party.

§ 7–305. But:

If a foreign corporation is doing or has done any intrastate, interstate, or foreign business in this State without complying with the requirements of Subtitle 2 of this title, neither the corporation nor any person claiming under it may maintain a suit in any court of this State unless it shows to the satisfaction of the court that:

(1) The foreign corporation or the person claiming under it has paid the penalty specified in § 7–302 of this subtitle; and

(2) Either:

(i) The foreign corporation or a foreign corporation successor to it has complied with the requirements of Subtitle 2 of this title; or

(ii) The foreign corporation and any foreign corporation successor to it are no longer doing intrastate, interstate, or foreign business in this State.

§ 7–301. Section 7–302 prescribes sanctions by way of fines. *See also* §§ 7–303 and 7–304.

## II

### A

In an ex contractu action brought in the Circuit Court for Montgomery County, Tiller Construction Corporation sued Ronald Nadler, individually, and Glenmar Cinestate, Inc., a Maryland corporation.[2] The case was called for trial on 20 April 1993. On the morning of trial Tiller filed an Amended Bill of Complaint. It alleged that Tiller was a New York corporation, registered and doing business in the State of New York. Ronald Nadler was a resident of the State of Maryland and the chief executive officer of Glenmar, as well as its principal, if not only, stockholder. To the best of Tiller's information and belief Glenmar leased certain space in the Westridge Square Shopping Center, located in Frederick, Maryland, and in Cranberry Mall, located in Westminster, Maryland. Tiller and Nadler entered into two contracts, one calling for Tiller to do "the work" for Nadler at Westridge for $637,000, and the other for Tiller to do "the work" for Nadler at Cranberry for $688,800. Ronald Nadler requested that Tiller send all bills to Glenmar, the lessee at both shopping malls. Ronald Nadler agreed to be personally liable to Tiller for the payment of both contracts. At the time of the suit, due to change orders and credits, there was a net balance due for the Cranberry project in the amount of $229,799.46, and on the Westridge project the sum of $264,273.85, which Nadler

---

2. Reference to "Nadler" hereinafter shall include both Ronald Nadler and Glenmar Cinestate, Inc. unless otherwise indicated.

refused to pay, although it had approved all work, including change orders and their cost, and even though the work had been performed in a timely, good and workmanlike manner. The Amended Bill of Complaint contained two counts alleging breach of contract. Count I sought damages in the amount due under the Cranberry contract, and Count II sought damages in the amount due under the Westridge contract. Tiller demanded judgment against Ronald Nadler and Glenmar plus interest, costs, and attorney's fees.

## B

Also on the morning of trial, Nadler handed to the court and to opposing counsel a Motion to Dismiss based on § 7–301. In his Motion Nadler asserted that Tiller was a New York Corporation "which has never qualified to transact business in the State of Maryland." Appended to the Motion was a certification by the custodian of records of the Maryland Department of Assessments and Taxation that

> there is no record of a foreign or domestic corporation by the name of Tiller Construction Corp.

Also appended to the Motion were excerpts from depositions of Mr. Tiller and his daughter. She was President and Treasurer of Tiller Construction Corporation. Both Mr. Tiller and his daughter said that they did not remember any documents being executed registering or qualifying the company to do business in Maryland.

Tiller's counsel conceded that the corporation had not qualified to do business in this State.[3] His point, however, was that Tiller was not obliged to qualify because its activities did not mount up to doing business in Maryland in the contemplation of the statute. Tiller's counsel claimed that Tiller "just had occasional business" in Maryland. Nadler's counsel countered by asserting that there were two separate contracts to

---

3. Tiller's original Bill of Complaint declared that Tiller "is a New York corporation, registered to do business in the State of Maryland." As we have seen, that averment did not appear in the Amended Bill of Complaint.

build movie theaters, each "in excess of one-half million dollars." The contracts involved

> the employment of a substantial number of subcontractors, most of whom were Maryland subcontractors, involved maintaining a supervisor on each job, as well as they opened Maryland bank accounts. . . .

He claimed that "all of this is really uncontested." After discussion about the timeliness of the motion and other preliminary matters, the court reserved ruling and called for the trial to begin on the merits.

The first witness was Bruce Tiller, Vice President and stockholder of Tiller Construction Corporation, who was called to testify on behalf of his company. Mr. Tiller told the court that he first met Nadler in 1986 at Frederick, Maryland when a Mr. Manus, for whom he had done a considerable amount of work in other states, asked him to give a projected cost on the construction of two cinemaplexes. Nadler called Mr. Tiller in the spring of 1987 and asked if he would build the theaters for him on the same basis as given Manus. Mr. Tiller checked with Manus, was informed that Manus was not going through with the project and had no objection to Tiller building the cinemaplexes for Nadler. Mr. Tiller told Nadler that he would build the theaters on the same basis as proposed to Manus. At Nadler's request, Mr. Tiller came to Maryland to confer with an architect. The plans for the Westridge project were completed and a contract was executed by Nadler and Tiller on that project at a base bid of $637,000. A contract was also executed on the Cranberry Mall project calling for a cost of $688,800. The contracts were standard A.I.A. contracts. The Westridge project was about 98% complete late in December 1987. The Cranberry project was about 98% complete when Tiller received a letter from Nadler's attorney dated 26 January 1988. It expressed dissatisfaction with Tiller and how the projects were being handled. In the letter, Nadler's attorney also complained about Mr. Tiller's "personal conduct" in handling the work and contended that the "construction and management of the projects has been most deficient." The attorney advised:

I have met with Ron Nadler over the past several days and it is his decision that Glenmar must terminate you from the two jobs in Frederick and Cranberry [as of 22 January 1988].

It was elicited from Mr. Tiller that on the Westridge and Cranberry projects Tiller and its superintendents "interacted not only with Mr. Nadler ... but also interacted at times with the architect." The meetings were held on the job sites in Maryland. All but one of the dozen or so subcontractors on each job were from Maryland. Tiller opened a bank account in the Sovran Bank of Maryland and the Maryland subcontractors were paid by checks drawn on that account. Each project had a telephone for the duration of the jobs, listed with information in the name of Tiller Construction Corporation. Tiller billed the subcontractors for the work they did. The superintendent on the Cranberry project was an employee of Tiller and the superintendent on the Westridge job was an independent contractor hired by Tiller.

Later in the day, the court asked Nadler's counsel how much more time he expected to spend cross-examining Mr. Tiller: "Do you figure another two hours with this witness?" The response was, "A lot more, Your Honor."

THE COURT: Is that two days or two hours? I really need a range.

NADLER'S COUNSEL: I would say at least another four hours, Your Honor, because we have got all these change orders.

The court announced that it "would like to finish the plaintiff's case tomorrow" and then consider whether Tiller had been doing business in such a way as to fall under the requirements of Title 7 of the Corporations and Associations Article. Depending on the result, he told the parties, the case might end without further ado. Then the court suggested an alternative route. It told Tiller's counsel:

It may well be that the way to approach this is ... to let you develop any further evidence that you want to develop on the issue of presence or non-presence in the State for

purposes of qualification, let [Nadler's attorney] do the same, and limit our inquiry to those issues, and then go directly to a motion to dismiss to see where we are before we spend four hours on the change orders.

After both sides agreed to the suggestion, the court announced a 10-minute break after which "I would like you [Nadler's lawyer] to confine your cross-examination ... to ... any further questions that you have got on the issue of qualification." Turning to the lawyer for Tiller, the court continued:

> You may redirect on that issue, and we will reserve. I have some questions that I want to ask on the issue of qualification. If I feel that our record is complete by the end of today, we will argue first thing tomorrow morning on the issue of qualification. Then, depending on the ruling, we will either go forward with all the supplemental matters or the case will be over.

After the recess, attention returned to Bruce Tiller, who was still on the witness stand. Now, however, the trial had transmogrified into a hearing on Nadler's motion to dismiss. In addition to his former testimony—ostensibly on the merits, but, particularly on cross-examination, reaching deeply into the question of "doing business" in Maryland—Mr. Tiller testified that the supervisors on the construction jobs lived in a motel and their rooms were paid by Tiller as a business expense. Painters and clean-up men were brought in from New York and stayed in Maryland until the jobs were completed. Tiller did the "oversight. [It] saw how things got done." Liability insurance and workers' compensation insurance were obtained, covering each project in the name of Glenmar as the insured. There was a sign at each project advertising Tiller as the contractor. A local construction permit was obtained. Subcontractors supplied all their own equipment from Maryland. Four or five months were spent on the projects.

As for Tiller's other business activities during the time it was engaged in construction work for Nadler, Mr. Tiller

testified that the company was building a small hostel for the State of New York at a cost of $400,000 or $500,000 and a $300,000 project for AMC Theaters in Michigan. He added that Tiller might have been involved in a hospital project at that time, but he was not sure.

## C

When court reconvened the next day, the judge announced:

We are here this morning to consider the defendant's motion to dismiss based on failure of the plaintiff corporation to qualify under the laws of Maryland. I am prepared to hear argument on that now.

Nadler reiterated his contention that Tiller was required to qualify as a foreign corporation to do business in Maryland. Tiller had "pervasive activity in the State of Maryland," he argued. He said that he was relying on *Snavely, Inc. v. Wheeler*, 74 Md.App. 428, 538 A.2d 324 (1988) to support his Motion to Dismiss. Tiller countered that it was not engaged in so much business in Maryland as to bring it within the requirements of the foreign corporations statute. *Snavely*, it added, involved far more pervasive intrastate business than was represented by the Westridge and Cranberry construction projects.

## III

In *Snavely, Inc. v. Wheeler*, the Court of Special Appeals was called upon to determine under what circumstances an unqualified foreign corporation was doing business in Maryland in the contemplation of § 7–203 (qualification of a foreign corporation to do intrastate business), in the light of § 7–103 (activities not considered intrastate business), so that § 7–301 (failure to qualify—maintenance of suit) would preclude access to the Maryland courts. Robert M. Bell, then a judge of the Court of Special Appeals and now a judge of this Court, writing for a panel of the intermediate appellate court, made a thorough analysis of the principles that have been applied to

determine when a foreign corporation is doing intrastate business in Maryland. Judge Bell concluded:

> The appellate decisions of this State make clear that "a foreign corporation is doing business within a state when it transacts some substantial part of its ordinary business therein." *S.A.S. Personnel Consultants, Inc. v. Pat–Pan, Inc.*, 286 Md. 335, 339, 407 A.2d 1139 (1979) quoting *Chesapeake Supply and Equipment Corp. v. Manitowoc Eng'r Corp.*, 232 Md. 555, 562, 194 A.2d 624 (1963). *See Finch v. Hughes Aircraft Corp.*, 57 Md. App. 190, 245, 469 A.2d 867, *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1190, 84 L.Ed.2d 336, *reh'g denied*, 471 U.S. 1049, 105 S.Ct. 2043, 85 L.Ed.2d 341 (1985), *G.E.M., Inc. [v. Plough, Inc.]*, 228 Md. [484,] 488–489, 180 A.2d 478 [ (1962) ].

74 Md.App. at 434, 538 A.2d 324.

> Such a corporation is deemed "present" in the state when it does "a substantial amount of localized business in this State."

*Id., quoting Yangming Transport v. Revon Products*, 311 Md. 496, 502, 536 A.2d 633 (1988). "Where," however,

> the corporation does not engage in significant business activity in Maryland, § 7–301 has been interpreted to permit a corporation to maintain an action in the courts of this State even though it has neither registered nor qualified.

*Snavely*, 74 Md.App. at 434, 538 A.2d 324, citing to *Yangming*, 311 Md. at 505, 536 A.2d 633.

Judge Bell pointed out:

> Mere solicitation, even if accompanied by activities directly related to the solicitation, including interstate delivery of the goods into the state, is not sufficient to constitute "doing business"; however, solicitation, accompanied by the shipment of goods and an extensive set of activities or management functions in the state, is. *S.A.S. Personnel Consultants*, 286 Md. at 339, 407 A.2d 1139; *Gilliam v. Moog Indus., Inc.* 239 Md. 107, 109, 210 A.2d 390 (1965); *White v. Caterpillar Tractor Company*, 235 Md. 368, 372–74, 201

A.2d 856 (1964), *Thomas v. Hudson Sales Corp.*, 204 Md. 450, 465–66, 105 A.2d 225 (1954).

*Snavely*, 74 Md.App. at 435, 538 A.2d 324. The resolution of "doing business" is on an ad hoc basis.

> Whether the acts engaged in by the foreign corporation are sufficient to constitute "doing business" must be determined from the facts of each case, with particular emphasis on the nature and extent of the business and activities occurring in the forum state. *S.A.S. Personnel Consult., supra,* 286 Md. at 339, 407 A.2d 1139; *White v. Caterpillar Tractor Company,* 235 Md. at 372, 201 A.2d 856.

*Id.*

> Among the factors to be considered are: (1) whether the foreign corporation pays state taxes; (2) whether it maintains property, an office, telephone listings, employees, agents, inventory, research and development facilities, advertising and bank accounts in the state; (3) whether it makes contracts in the state; and (4) whether its management functions in the state are pervasive.

*Id.* The factors designated are in complete accord with the factors we set out in *S.A.S. Personnel Consult. v. Pat–Pan,* 286 Md. 335, 407 A.2d 1139 (1979). We summed up in *S.A.S.:*

> A determination whether a particular act or set of acts constitutes "doing business" depends upon the facts of each individual case, and rests not on a single factor, but rather on the nature and extent of the business and activities which occur in the forum state.

286 Md. at 339, 407 A.2d 1139. *Snavely*, 74 Md.App. at 435, 538 A.2d 324, recognized, as we noted in *S.A.S.,* 286 Md. at 339, 407 A.2d 1139, that

> [t]he party asserting that an unregistered or unqualified foreign corporation is "doing business within the state" carries the burden of proof.

*Snavely* accurately reflects what its ancestors in this Court and in the Court of Special Appeals have expressed and applied.

## IV

The trial judge pronounced an opinion from the bench. He referred to § 7–203 ("Qualification to do intrastate business") and § 7–301 ("Failure to register or qualify—Maintenance of suit"). He said of § 7–301:

> This is, to be sure, a real provision. ... [F]oreign corporations who have failed to comply, regardless of the validity of their claim on the merits, have been denied access to our courts, period.

He explained:

> It is not a matter of the court having special solicitude for people who are owed money. It is a question of whether our courts are, by legislative provision, open to parties to use our courts in the event they don't comply.

The judge recognized that the burden of proving that an unqualified foreign corporation is doing business in this State is upon the party presenting that defense, citing to *S.A.S.* He observed that Maryland's foreign corporation law

> is not unique to the State of Maryland. It is done all over the United States. Frankly, [Maryland's provisions] I think [are] based on the Model Business Corporation Act, ... so there is nothing really unique about Maryland's statutes, either.

The judge noted, "It is stipulated that, in fact, ... Tiller Construction Corporation was never qualified to do business in the State of Maryland." And so, he concluded,

> the question becomes, were they, in fact, doing business intrastate within the meaning of the Corporations and Associations Article?

He looked to *Snavely,* 74 Md.App. 428, 538 A.2d 324, quoting its conclusion at 434, 538 A.2d 324, which in turn quoted *S.A.S.,* 286 Md. at 339, 407 A.2d 1139, that

> "[t]he appellate decisions of this State make clear that 'a foreign corporation is doing business within a state when it transacts some substantial part of its ordinary business therein.'"

He compared the statutes to those with respect to home improvement companies:

> It is, I would note, fairly common in this State for builders who are within the State, who fail to get home improvement licenses, to be denied the right to recover on their contracts because our statutes say very clearly if you are not licensed, you can't use our Courts. Not that you are not morally entitled to be paid, but simply, our Courts are closed to you. So, I must view this with this in mind.

The trial judge looked at the facts in the light of the factors designated in *Snavely,* which may be considered in determining whether Tiller was doing business in Maryland, as he found those facts to be from the evidence before him. As to taxes:

> To the extent that there were contracts made with local suppliers, that sales taxes were paid in this State.

> .    .    .    .    .

> [A]ll inventory was, in fact, local. According to Mr. Tiller, it was all bought locally and paid for locally, and the tax paid locally as well.

As to an office and telephones:

> While there was no office maintained here, there was a motel room leased for a considerable period of time. There was presence of the corporation for up to five months. There was, while no, as I said, formal office, there was a sign on the job site and telephones listed in information.

As to management functions and bank accounts:

> There was no substantial advertising in the State, although there was, in fact, a bank account that was maintained in the State. There were, in fact, fairly pervasive management functions in terms of these two projects. That, in fact, was what the general contractor was engaged to do.

As to the amount of Tiller's business which was conducted in Maryland:

The fact of the matter is that for the five-month period or so that Tiller Construction was on the job in Maryland, the value of the projects in question was far better than 50 percent of its income during that period of time based on the testimony given yesterday.

Mr. Tiller indicated that these two projects alone were in excess of $1 million. He mentioned a project in Detroit and another in New York State. Whatever it was, it was a substantial part, whatever the exact percentage, of the revenues of the corporation in that time frame.

The judge rejected Tiller's notion that "there must be a continuing course of conduct, and that coming in and even doing all these things is not sufficient to cause the corporation to be found to be doing business for purposes of having to qualify." The judge declared:

What we have here, essentially, is a builder coming in from a foreign jurisdiction to basically construct two projects of some substance over a five-month period, all aspects of the project. They contract for services, as defense counsel points out, to buy supplies here, to manage, to basically set up shop here, whether or not you have got a desk and chair or office, but basically to do all the operations in this case.

At this point the judge was on solid ground. He had approached the question whether Tiller was doing business in Maryland by assessing its activities pursuant to the factors noted in our appellate opinions and concluded that Tiller had indeed transacted some substantial part of its ordinary business in Maryland.

Then, however, the trial judge looked to 36 Am.Jur.2d Foreign Corporations § 351, which he said concerned "construction work relative to doing business." He quoted 36 Am.Jur.2d:

"Although there is some support for a contrary view, according to a number of cases a foreign corporation which engages in doing construction work, although it engages in performing but a single construction contract, engages in

business within the state, and therefore becomes subject to state laws regulating the doing of business therein by foreign corporations. The performance of such work is not deemed to fall within the rule that a single or isolated transaction will not amount to doing business."

He found 17A *Fletcher Cyclopedia of the Law of Private Corporations* to be of the same effect, providing at § 8469:

"As a general rule, engaging in construction work within a state is not deemed to fall within the single or isolated transaction rule."

The judge discovered what he deemed to be overwhelming authority on the issue in 90 A.L.R.3d 937 under the heading, "Construction Work by Foreign Corporation as Doing Business for Purposes of Statute Requiring Foreign Corporation to Qualify as Condition of Access to Local Courts." It provided, the judge explained,

the really dispositive article on this [question], and it is absolutely, 100 percent on point. . . .

"That is our case," the judge declaimed.

That is exactly the case we have, and there are, collected in this note, numerous cases from numerous jurisdictions where vastly the majority rule is, you have got to qualify.

He perused the cases listed "trying to determine what kind of work had been done in different cases and the duration of the projects." He mentioned, without specific citation, cases involving contracts for construction from Indiana, Montana, Pennsylvania and Texas. All of the durations of work were "essentially the same or less than the time spent here, and the finding was that"

the foreign corporation had failed to register and was, therefore, denied access to the courts.

■ The *Fletcher* general rule, however, is contrary to the law of Maryland. Our closed-door statute and *Snavely* and its ancestors reject as a universal proposition that performing a single act of construction constitutes "doing business." *S.A.S.*

stated at 286 Md. at 339, 407 A.2d 1139, as we have seen, that "doing business"

> depends upon the facts of each individual case, and *rests not on a single factor*, but rather on the nature and extent of the business and activities which occur in the forum state.

(emphasis added). *Yangming* noted that this Court "has not given § 7–301 an entirely literal construction." 311 Md. at 502, 536 A.2d 633. "Specifically," *Yangming* asserted, we have

> not construed § 7–301 as listing three, disjunctive factors, any one of which, if present, could bar an unregistered or unqualified corporation from suing in Maryland courts.

*Id. Yangming* emphasized:

> Instead, we have held that § 7–301 embodies a test for determining whether a foreign corporation is "doing business" in Maryland.

*Id. Yangming* explained:

> Under this test, § 7–301 bars an unqualified or unregistered foreign corporation from suing in Maryland courts only if the corporation is doing such a substantial amount of localized business in this State that the corporation could be deemed "present" here.

*Id.* Of course, the type of activity in which the corporation engages may be considered with other factors in determining whether the corporation is "present" here and doing intrastate business. But the type of activity, including construction of a building, may not, standing alone, suffice to establish that the corporation is doing intrastate business in Maryland.

## V

Tiller appealed. Before decision by the Court of Special Appeals, we ordered the issuance of a writ of certiorari on our own motion.

This appeal boils down to whether the evidence showed that Tiller was present in Maryland and "doing intrastate business" here. The trial judge reached the correct

conclusion, but in part for the wrong reason. Our task, however, is to review the propriety of the judgment, not of the opinion rendered in arriving at the judgment. *See Andrews v. Andrews,* 242 Md. 143, 153–154, 218 A.2d 194 (1966); *Velasco v. P.E. Church in Maryland,* 200 Md. 634, 640, 92 A.2d 373 (1952); *Alleghany Corp. v. Aldebaran Corp.,* 173 Md. 472, 478–479, 196 A. 418 (1938); *Methodist Church v. Browne,* 39 Md. 160, 163 (1873). The trial judge's grant of the Motion to Dismiss was not erroneous. We shall not disturb it. Therefore,

*JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED;*

*COSTS TO BE PAID BY APPELLANT.*